[No. B193235. Second Dist., Div. Seven. Sept. 19, 2007.]

LINCOLN PLACE TENANTS ASSOCIATION et al., Plaintiffs and Appellants, v.
CITY OF LOS ANGELES et al., Defendants and Respondents.

428

COUNSEL

John B. Murdock and Howard Posner for Plaintiffs and Appellants.

Nemecek & Cole, Jonathan B. Cole, Greg Ozhekim and Mark Schaeffer for Defendant and Respondent AIMCO Venezia LLC.

Rockard J. Delgadillo, City Attorney, Claudia McGee Henry, Assistant City Attorney, and Gerald M. Sato, Deputy City Attorney, for Defendant and Respondent City of Los Angeles.

Tenderloin Housing Clinic and Stephen L. Collier for San Francisco Tenants Union, Housing Rights Committee of San Francisco, AIDS Legal Referral Panel of the San Francisco Bay Area and Asian Law Caucus as Amici Curiae.

OPINION

**ZELON, J.**—Appellants Lincoln Place Tenants Association (LPTA) and Ingrid Mueller (Mueller) appeal from judgment (1) denying their petition for writ of mandate to compel the City of Los Angeles (City) and its agencies to enforce mitigation measures imposed pursuant to the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.) contained in a vesting tentative tract map the City's agency issued to AIMCO Venezia, LLC (AIMCO) concerning the redevelopment of Lincoln Place Garden Apartments, and (2) refusing to enjoin AIMCO from proceeding with Ellis Act evictions and unlawful detainer actions on the remaining tenants of Lincoln Place. The principal issues on appeal are whether the Ellis Act[1] permits AIMCO to evict the tenants without complying with the mitigation provisions, and whether writ relief was properly denied in any event because the tenants could assert their claims AIMCO had failed to comply with the mitigation conditions as defenses to the unlawful detainer proceedings. We reverse.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The Lincoln Place Garden Apartments, built between 1949 and 1951, is a large 38-acre garden-style complex located in Venice. The complex consists of 795 apartments located in 52 buildings, and incorporates open green

---

[1] Government Code section 7060 et seq.

spaces and landscaping on winding streets and cul-de-sacs. Currently, only 13 tenants remain in the complex. We discuss the history of the case as it relates to the mitigation conditions at issue.[2]

## I. *The Redevelopment Project and the VTT.*[3]

In 1991, AIMCO's[4] predecessor applied to the City for subdivision approval to demolish Lincoln Place, and replace it with 654 market-rate condominiums and townhomes, 52 moderate-income townhomes, and 144 low-income rental apartments (the project). The project was to be built over a 10-year period, with the 144 low-income apartments to be built first.

In 1993, the City's planning department published a draft environmental impact report (EIR). In April 1994, after modifications, revisions and inclusion of new mitigation measures, the City's planning department recommended certification of the final EIR. In late 1994 and early 1995, the planning commission held hearings on the Project after the Committee to Preserve Lincoln Place and the LPTA appealed the planning commission's recommendation. After the hearings, the planning commission directed its staff to clarify the Project conditions and EIR mitigation measures to "prevent the issuance of demolition permits unless each of the households affected by such permit are afforded the opportunity to relocate to a comparable or better vacant unit on site at no cost either for the move or in additional rent above the amount paid [o]n the unit scheduled for demolition. . . . Thus, every household at the Project site . . . [is] guaranteed the right to remain at Lincoln Place in a comparable or better unit at their then current rent unless they choose voluntarily to move from the site (in which event the Applicant will still be obliged to provide relocation assistance)."

In April 1995, the City's planning commission approved AIMCO's vesting tentative tract map. The tenants and others appealed the approval, contending the project would remove affordable housing stock from the market.

In September 1995, while the tenants' appeal was pending, as part of its inducement to the City to approve the project, AIMCO's predecessor devel-

---

[2] Some portions of the facts herein are taken from our opinion in *Lincoln Place Tenants Assn. v. City of Los Angeles* (2005) 130 Cal.App.4th 1491 [31 Cal.Rptr.3d 353] (*Lincoln Place II*).

[3] Vested tentative tract map.

[4] AIMCO's parent, Apartment and Investment Management Company, is a Maryland corporation with its principal offices in Denver, Colorado. In 2004, it held real estate assets in excess of $10 billion, and owned hundreds of apartment buildings across the country. AIMCO, as used in this opinion, shall include AIMCO and its predecessor.

oper wrote to the City, noting that current Lincoln Place buildings were "nearing the end of their useful life expectancy" and the site did not meet current code requirements for onsite parking, access for the disabled, and energy or water conservation. Further, "[t]o ensure that existing tenants are not displaced, the applicant has made several unprecedented commitments, all of which are reflected in the Planning Commission's Project approval: [¶] a. The Project would be phased over a period of 10 years; [¶] b. No existing tenant would be involuntarily displaced from the site; and [¶] c. No particular phase of the Project would proceed unless every existing tenant in such phase could be supplied with an existing unit or a new unit at the owner's cost." The developer further stated that "all of the Project's tenant protection and affordable housing commitments were made voluntarily, and in the absence of any adopted City policy or regulation requiring greater (or even similar) mitigation. Moreover, to the best of our knowledge, no other privately funded subdivision or condominium conversion project in the City of Los Angeles has ever provided greater tenant protection and affordable housing benefits."

In 2002, after litigation relating to the removal of affordable housing from the market was resolved, the City referred the matter to its "PLUM" (planning and land use management) committee for review. The PLUM committee concluded that the 1994 EIR was sufficient, and held public hearings on the project in November 2002. The City approved the project based on the PLUM committee's recommendation. In connection with the approval, on November 20, 2002, the City certified EIR No. 91-0458 with its incorporated findings, conditions, and mitigation measures. The City approved the proposed subdivision of the property, and incorporated into VTT Map No. 51377 the mitigation conditions of the EIR.

The VTT's "Relocation Plan" provided that "[p]rior to the issuance of each building permit or demolition permit associated with the proposed project, the applicant will submit a Relocation Plan for review and approval by the General Manager of the Los Angeles Housing Department." The Relocation Plan would permit current tenants of the complex to relocate to a comparable or better vacant unit at the Project, or opt to receive the maximum relocation payment permissible under the City's Rent Stabilization Ordinance (RSO),[5] or to accept one of the newly constructed affordable rental units, including free moving costs. The Relocation Plan also provided for an informational program "designed to notify existing Lincoln Place residents of their rights under the RSO and the applicant's Relocation Plan as approved by the City."

---

[5] Los Angeles Municipal Code section 151.00 et seq.

AIMCO was required to maintain records of the relocation and actions taken by each of the existing Lincoln Place households, and to provide summary information annually to the General Manager of the Los Angeles Housing Department throughout the development of the Project.[6]

---

[6] The VTT imposed detailed requirements regarding existing Lincoln Place tenants:

"5b. <u>Relocation Plan</u>. Prior to the issuance of each building permit or demolition permit associated with the proposed project, the applicant will submit a Relocation Plan for review and approval by the General Manager of the [Los Angeles Housing Department] and the Advisory Agency. The Relocation Plan shall specify all operating details whereby existing households will be provided options for relocation, as follows: (MM):

"—Accepting the applicant's offer to relocate to a comparable or better vacant unit on site at no cost either for the move or in additional rent above the amount paid in the unit scheduled for demolition at the household[']s options; or

"—Accepting the maximum relocation payment required under the City's Rent Stabilization ordinance, plus applicant [will be] provided assistance in locating a comparable replacement unit within the Venice Community Plan area; or

"—Accepting one of the newly constructed rental units, including free moving costs and no additional rent above that amount paid in the unit scheduled for demolition. . . .

"—Purchasing one of the 52 moderate income townhomes. . . .

"The Relocation Plan shall include making available at the applicant's sole expense, the services of a relocation specialist to assist existing residents wishing to relocate within the Venice Community Plan area.

"The Relocation Plan shall also include a written informational program designed to notify existing Lincoln Place residents of their rights under the RSO and the applicant's Relocation Plan as approved by LAHD and the Advisory Agency.

"As part of the Relocation Plan, the applicant shall be required to maintain records of the relocation actions taken by each existing Lincoln Place household. Summary documentation shall be provided annually to the General Manager of LAHD throughout development of the project and a copy shall be made available to the Advisory Agency.

"For purposes of this condition and any other provisions relating to provision of relocation benefits, the term 'Existing Household' shall mean any tenant of Lincoln Place who has lived in Lincoln Place for a minimum of 12 months as of the date of final project approval. This shall include legal residents who meet the residency requirement even though they may have moved within Lincoln Place during their residency whether or not such tenants executed any form of release and shall include all tenants meeting the residency requirement [who] executed any form of release and shall include all tenants meeting the residency requirement whether or not they executed any form of release upon commencement of their residency within Lincoln Place."

Condition 13 provided: "[A]ll tenants [shall] be given a minimum 180-day written notice of termination of tenancy prior to demolition. This notice cannot be given before the date on the Advisory Agency's Decision Letter (including all appeal periods and actions thereon) nor prior to the subdivider contracting with a relocation assistance specialist. The subdivider must inform all tenants of their relocation assistance rights when the 180-day written notice to terminate tenancy is given. The subdivider must submit a City form CP-6333 signed by each tenant evicted in order to clear this condition. (MM)."

The VTT stated that "[s]ignificantly, the Project conditions and EIR mitigation measures prevent the issuance of demolition permits unless each of the households [a]ffected by such permit are afforded the opportunity to relocate to a comparable or better vacant unit on site at no cost either for the move or in additional rent above the amount paid in the unit scheduled for demolition. ([S]ee Advisory Agency Condition 5b[.]) Thus, every household at the Project site . . . will be guaranteed the right to remain at Lincoln Place in a comparable or better unit at their then current rent unless they choose voluntarily to move from the site (in which event the Applicant will still be obliged to provide relocation assistance). Accordingly, there is no possibility that the Project will involuntarily displace current Lincoln Place tenants at any income level."

Petitioners contend that AIMCO has not sent any of the Lincoln Place tenants Los Angeles City Planning Department Form CP-6333, required by mitigation measure 13, to be signed by the tenants and filed with the City. In addition, petitioners contend that none of the tenants has ever received a notice of relocation assistance package as set forth in condition 5b, including a description of the relocation option "to relocate to comparable or better vacant unit on site." The record does not reflect that AIMCO has kept records concerning tenant relocation in the fashion the VTT requires, or that it has provided the required information to the Los Angeles City Housing Department.

## 2. *Lincoln Place II.*[7]

In 2003, AIMCO applied to the City for demolition permits.[8] LPTA filed a petition for writ of mandate seeking to have the City set aside its approval of the Project and to stay demolition of the units on the grounds that the City's findings certifying the EIR were inadequate because they failed to adequately consider the historical and cultural impact of demolishing the apartments. Another party, the 20th Century Architectural Alliance, filed a petition seeking to set aside the demolition and to enjoin the issuance of further demolition permits contending the permits were issued in violation of CEQA.

*Lincoln Place II* found that although the permits were properly issued under the City's provisions relating to buildings of historical or architectural significance, the City failed to comply with CEQA when it issued demolition permits without requiring compliance with certain predemolition conditions

---

[7] *Lincoln Place II, supra,* 130 Cal.App.4th 1491. *Los Angeles Lincoln Place Investors, Ltd. v. City of Los Angeles* (1997) 54 Cal.App.4th 53 [62 Cal.Rptr.2d 600] (*Lincoln Place I*), discussed *post,* was the first appellate decision relating to the Lincoln Place redevelopment project.

[8] Apparently, although some of the buildings at the site have already been demolished, 40 of the original buildings remain. (*Lincoln Place II, supra,* 130 Cal.App.4th at p. 1503.)

(that AIMCO take photographs of the complex and offer the buildings for sale) of the VTT, and in failing to conduct CEQA review to determine whether the conditions were infeasible. (*Lincoln Place II, supra*, 130 Cal.App.4th at pp. 1504–1508.)

In particular, we held that "In the present case, the city failed to proceed according to law by permitting the owners of Lincoln Place to proceed with the demolition of structures on the property without complying with the predemolition conditions, without stating a legitimate reason for ignoring those mitigation measures, and without preparing and circulating a supplemental EIR. For these reasons the demolition permits were unlawful and invalid and the trial court erred in denying Alliance's petition for a writ of mandate and an injunction to prevent further demolition until the owners complied the existing preconditions on demolition or the city modified or deleted those conditions through a supplemental EIR." (*Lincoln Place II, supra*, 130 Cal.App.4th at p. 1510.)

On remand, the trial court enjoined any further demolition of Lincoln Place. No public hearings have been held since July 13, 2005, to change any of the project's conditions.

### 3. *Tenant Evictions and the Unlawful Detainer Actions.*

In 2004, AIMCO employed a relocation assistant who provided relocation consulting to the tenants of Lincoln Place. At that time, 350 of the 600 remaining units at Lincoln Place were occupied. From 2004 until July 31, 2006, the relocation assistant relocated 250 tenants, all of whom executed "Voluntary Relocation Agreements" and received relocation benefits and assistance. Some tenants received mortgage assistance and became first-time home buyers. Many of the remaining tenants, including plaintiff Mueller, refused relocation assistance.

In March 2005, AIMCO began serving the remaining tenants with eviction notices, and filed Ellis Act notices with the City. The March 18, 2005 notice relating to plaintiff Mueller relied exclusively on the RSO for the authority to evict, and stated that she was eligible to receive $3,200 in relocation assistance and the unit was to be vacated by July 18, 2005. AIMCO stated the justification for removing the unit from the rental market was that "Owner is removing the accommodations to withdraw the accommodations from the rental housing market."

In April 2005, AIMCO sent a letter to Lincoln Place tenants stating that "[c]ertain activists are providing wrong information implying that the Ellis Act evictions are flawed or illegal. The City of Los Angeles approved the Ellis Act evictions on March 18, 2005. . . . Two attempts to get historical designation for Lincoln Place have failed. The current second appeal [*Lincoln Place II*] has no bearing on the legality of the Ellis Act and these activists are trying to confuse the two issues. [¶] These activists say that by signing up for the bonus [relocation] program you would lose your right of first refusal if AIMCO re-rented your unit. This is true, but irrelevant since AIMCO is tearing down all the buildings and is going out of the rental business on this entire property . . . ."

On May 31, 2005, AIMCO extended the right of certain tenants to remain until August 31, 2006. AIMCO continued to offer relocation assistance in the form of relocation to alternative housing offsite. A large number of tenants who had left Lincoln Place voluntarily contended that they had not been given the option of staying at Lincoln Place, and had they been given the option to remain at Lincoln Place by relocating to another apartment, they would have chosen that option.

In July 2005, AIMCO commenced unlawful detainer proceedings against the remaining tenants.[9] As of August 8, 2006, there were 73 unlawful detainer cases pending on appeal to the appellate department of the Superior Court. The unlawful detainer proceedings have been stayed pending this appeal.

In July 2005, Frieda and Leslie Marlin, tenants of the Lincoln Place Apartments, filed a declaratory relief action against AIMCO challenging the propriety of AIMCO's March 2005 Ellis Act notices. We reversed the court's order granting the motion to strike the complaint. (*Marlin v. Aimco Venezia, LLC* (2007) 154 Cal.App.4th 154 [64 Cal.Rptr.3d 488].)

On August 22, 2006, LPTA and Mueller filed a petition for writ of supersedeas, requesting this court to stay the unlawful detainer actions. On September 5, 2006, we denied their petition.

---

[9] Both AIMCO and plaintiffs have requested us to take judicial notice of documents filed in the unlawful detainer proceedings. We take judicial notice of those documents. (Evid. Code, § 452, subd. (d)(1) [records of any court of this state may be judicially noticed]; Evid. Code, § 453 [judicial notice shall be taken of any matter specified in section 452 if the party requesting judicial notice (1) provides notice to the adverse party, and (2) furnishes the court with sufficient information to enable it to take judicial notice].)

### 4. *Writ of Mandate Proceedings.*

On June 8, 2006, LPTA filed a petition for writ of mandate[10] seeking to compel the City to comply with the mitigation measures adopted under CEQA in the VTT, and to enjoin AIMCO from evicting the remaining tenants from Lincoln Place. The petition alleged that AIMCO's eviction notices constituted an unfair business practice under the UCL (unfair competition law) because they violated conditions 5b and 13 of the VTT and that the City failed to review the eviction notices pursuant to its duties under CEQA to ensure the mitigation measures were enforced.

LPTA argued that the City failed to proceed in accordance with CEQA when it issued approval of the Ellis Act notices without requiring compliance with the preeviction conditions or conducting CEQA review to establish that the conditions were not prerequisites to eviction. Furthermore, injunctive relief was required to stop the evictions because they constituted unlawful business acts under the UCL. Finally, LPTA argued that violation of mitigation conditions constituted an unlawful business practice.

AIMCO and the City opposed the petition, raising numerous arguments. AIMCO contended that *Lincoln Place II* did not address its rights under the Ellis Act, but only precluded demolition where it had not complied with mitigation conditions; the petition was barred by collateral estoppel because *Lincoln Place II* established that only two mitigation conditions need be complied with (taking photographs prior to sale and offering the structures for sale) and that those conditions were preconditions to demolition only; the unrecorded VTT is not binding and cannot be used to interfere with AIMCO's rights under the Ellis Act; the Ellis Act does not implicate CEQA; the Ellis notices were privileged under Civil Code section 47; the action was barred by the statute of limitations of Public Resources Code section 21167, subd. (a); plaintiffs were attempting to preargue the unlawful detainer actions; and plaintiffs were not entitled to an injunction because they had an adequate remedy at law to assert their claims in the unlawful detainer proceedings.

The City contended its receipt of the Ellis Act notices did not constitute an approval or authorization to evict; under the Ellis Act, it could not condition AIMCO's right to evict on compliance with conditions 5b and 13; it could only exercise powers impliedly granted it by laws other than CEQA; the *Lincoln Place II* opinion did not control because it applied to demolition

---

[10] Code of Civil Procedure section 1085.

permits; the action was time-barred under Public Resources Code section 21167, subdivision (a); and the VTT did not provide authority to enforce conditions 5b and 13 because the subdivider was not required to record the map; the conditions did not apply until the map was recorded, and the map could expire before the conditions were complied with.

Petitioners responded that Civil Code section 47, subdivision (b) did not contain a privilege to violate CEQA; suit was not premature; traditional mandate proceedings were required to enforce the mitigation measures; the Ellis Act did not preempt the mitigation conditions; *Lincoln Place II* had already rejected the argument that the nonrecordation of the VTT affected its potency; and the statute of limitations did not apply to an action challenging mitigation enforcement.

At the August 16, 2006 hearing, the court indicated it was reluctant to make any rulings inconsistent with those made in the unlawful detainer proceedings, and chastised petitioners' counsel for failing, under Code of Civil Procedure section 1008, to point out the parallel proceedings in his brief where petitioners were requesting the same relief. Petitioners argued that the issues differed in the mandate proceedings from the unlawful detainer proceedings because of the CEQA issues and because the City was not a party to the unlawful detainer proceedings. Although petitioners argued that the evictions were contrary to the mitigation conditions, the court declined to issue a writ because it had already enjoined the demolition on remand pursuant to *Lincoln Place II, supra*, 130 Cal.App.4th 1491, and it believed demolition was at issue in this case because AIMCO needed to evict the tenants to commence demolition. Further, the trial court believed petitioners were trying to obtain a ruling contrary to those in the unlawful detainer proceedings, and that Los Angeles Municipal Code section 151.09, subdivision (E) provided that failure to give relocation assistance was a defense in an unlawful detainer proceeding. The court denied the petition and the request for a preliminary injunction.

## DISCUSSION

I. *THE ELLIS ACT DOES NOT PREEMPT ENFORCEMENT OF THE CEQA MITIGATION CONDITIONS.*

A. *Standard of Review and Principles of Statutory Construction.*

This case requires us to consider the interrelation of CEQA, the Ellis Act, and to a lesser extent, the Subdivision Map Act (Gov. Code, § 66410 et seq.),

to determine whether AIMCO had the absolute right under the Ellis Act to evict the remaining tenants of Lincoln Place. We address the issue of whether AIMCO could, through those Ellis Act notices and eviction proceedings against the remaining tenants of Lincoln Place, evade the CEQA mitigation conditions imposed by the City in connection with the Lincoln Place redevelopment project. We conclude it cannot.

■ Where two statutes touch upon a common subject, we must construe them with reference to each other and seek to harmonize them in such a way that neither becomes surplusage. (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 476 [66 Cal.Rptr.2d 319, 940 P.2d 906].) Two statutes must be read together and so construed to give effect to all the provisions of each statute. (*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 779 [38 Cal.Rptr.2d 699, 889 P.2d 1019].) Construing statutes in harmony with each other is preferred to a finding of preemption. (*San Mateo City School Dist. v. Public Employment Relations Bd.* (1983) 33 Cal.3d 850, 865 [191 Cal.Rptr. 800, 663 P.2d 523].) Furthermore, where one or more statutes appear to be in conflict, we must seek to avoid repeal of any statute by implication. " ' "[T]he presumption against implied repeal is so strong that, 'To overcome the presumption the two acts must be irreconcilable, clearly repugnant, and so inconsistent that the two cannot have concurrent operation. The courts are bound, if possible, to maintain the integrity of both statutes if the two may stand together.' " ' " [Citation.]" (*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 569 [71 Cal.Rptr.2d 731, 950 P.2d 1086].)

■ In construing the Ellis Act, CEQA, and the Subdivision Map Act, "our fundamental task is to ascertain the Legislature's intent so as to effectuate the purpose of the statute." (*Smith v. Superior Court* (2006) 39 Cal.4th 77, 83 [45 Cal.Rptr.3d 394, 137 P.3d 218].) We start with the language of each statute, giving the words their usual and ordinary meaning, and construe the statutory language in the context of the statute as a whole and the overall statutory scheme, giving significance to every word, phrase, sentence, and part of an act. We do not construe statutes in isolation, but rather read each statute with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain its effectiveness. If statutory terms are ambiguous, we may examine extrinsic sources, including the ostensible objects to be achieved and the legislative history. In such circumstance, we will choose the construction that comports most closely with the Legislature's apparent intent, and endeavor to promote rather than defeat the statute's general purpose, and avoid a construction that would lead to absurd consequences. (*Ibid.*)

We review matters of statutory construction de novo as issues of law. (*Burden v. Snowden* (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672].)

### B. *The Ellis Act.*

The 1985 Ellis Act[11] was the Legislature's direct response to *Nash v. City of Santa Monica* (1984) 37 Cal.3d 97 [207 Cal.Rptr. 285, 688 P.2d 894], in which the Supreme Court upheld the rent control ordinance of Santa Monica despite the fact that its practical impact was to compel the landlord of a rent-controlled apartment to remain in the rental business. (*Id.* at p. 111 (dis. opn. of Mosk, J.).) At the core of the Ellis Act is the prohibition on this type of restraint on a landlord's right to go out of the rental business: "No public entity . . . shall, by statute, ordinance, or regulation, or by administrative action implementing any statute, ordinance or regulation, compel the owner of any residential real property to offer, or to continue to offer, accommodations in the property for rent or lease . . . ." (Gov. Code, § 7060, subd. (a).)

Initially, case law strictly interpreted the Ellis Act consistent with its avowed purpose to permit landlords an unobstructed right to go out of the rental business. (See Gov. Code, § 7060.7.) In *City of Santa Monica v. Yarmark* (1988) 203 Cal.App.3d 153 [249 Cal.Rptr. 732] (*Yarmark*), the landlord sought to evict tenants and withdraw his rental units from the market; however, the city through section 1803, subdivision (i) of its city charter, prohibited eviction unless " '[t]he landlord seeks to recover possession to demolish or otherwise remove the controlled rental unit from rental residential housing use after having obtained all proper permits from the City of Santa Monica' " (203 Cal.App.3d at p. 164) and met removal conditions specified in section 1803, subdivision (t). (*Id.* at pp. 158–159.) *Yarmark* concluded the Ellis Act preempted the ordinance because the Ellis Act, a matter of statewide concern, entirely occupied the field of substantive eviction controls over landlords. (203 Cal.App.3d at pp. 166–167.) "In passing the Ellis Act, the Legislature has explicitly indicated it will tolerate no local measures providing substantive grounds for defenses in unlawful detainer actions brought by landlords who wish to go out of the business." (*Id.* at p. 171.) *Yarmark* did recognize that "Act contains explicit boundaries, leaving areas for local control in a fashion consistent with its terms." (*Id.* at p. 167.) Such boundaries included the right to regulate land use (Gov. Code, § 7060.1) and the conversion of rental units to condominiums (Gov. Code, § 7060.7). (203 Cal.App.3d at p. 167.)

---

[11] Statutes 1985, chapter 1509, section 1, page 5560, operative July 1, 1986.

A companion case to *Yarmark, supra*, 203 Cal.App.3d 153, *Javidzad v. City of Santa Monica* (1988) 204 Cal.App.3d 524 [251 Cal.Rptr. 350] involved the same parties as *Yarmark*. The landlord in *Javidzad* sought to demolish the now vacant units. (*Id.* at pp. 527–528.) *Javidzad* rejected the City's arguments that the ordinance was a permissible local regulation of land use and therefore not in conflict with the Ellis Act. On the contrary, *Javidad* reasoned, the section at issue did not purport to regulate the use of the land subsequent to the withdrawal of the units and therefore conflicted with the Ellis Act. "[T]he section does prescribe standards governing the Board's approval of a removal permit in the first instance and thus infringes on a landlord's decision to go out of the rental housing business and thereby directly conflicts with the Act." (203 Cal.App.3d at p. 530.)

*Lincoln Place I, supra*, 54 Cal.App.4th 53, addressed the City's ordinance restricting the developer's right to demolish the Lincoln Place apartments. The ordinance, among other things, prohibited the issuance of a demolition permit unless the landlord had City approval to build the project, namely, approved tract maps, or the landlord agreed not to build for 10 years. (*Id.* at p. 62.) *Lincoln Place I* held the ordinance unduly restricted the landlord's right to go out of business, concluding that the City "impermissibly infringed on the owner's right to simply go out of the rental business in the first instance by refusing to issue a demolition permit based on conditions which are not a part of the Ellis Act. . . . The practical effect of the ordinance is that the plaintiffs will be compelled to remain in the rental business at that location." (*Id.* at p. 64, citation omitted.) *Lincoln Place I* rejected the City's argument the ordinance amounted to lawful local regulation under the Ellis Act, finding the ordinance did not simply regulate future use of the land. (54 Cal.App.4th at pp. 64–65.)

*First Presbyterian Church v. City of Berkeley* (1997) 59 Cal.App.4th 1241 [69 Cal.Rptr.2d 710] (*First Presbyterian*) dealt with the Ellis Act ramifications of two ordinances, the first a local neighborhood preservation ordinance placing limits on the demolition of rental units, and the second a local landmark preservation ordinance (and a related EIR) regarding the proposed demolition of the removed units. (59 Cal.App.4th at p. 1243.) With respect to the landmark preservation ordinance, *First Presbyterian* upheld the ordinance. The city had affirmed the designation of the property at issue as a historical landmark, and required the preparation of an EIR relating to its proposed demolition. Subsequently, the church removed the property from the rental market by giving notice to the tenants pursuant to the Ellis Act, but did not prepare an EIR. (59 Cal.App.4th at p. 1243.) The trial court granted the city's writ petition, finding that the Ellis Act entirely preempted the city's demolition procedures (including those under CEQA) and concluded that the

Ellis Act "guaranteed" the granting of an application for demolition as a purely ministerial action. (59 Cal.App.4th at p. 1247.) On appeal, the court declined to read the Ellis Act to provide landlords seeking to demolish buildings "a blanket exemption from all environmental and landmark preservation land use regulations." (59 Cal.App.4th at p. 1254.) Instead, the court found the landmark preservation ordinance did not conflict with the Ellis Act because it did not require the landlord who had been denied a demolition permit to continue to offer the property for rent. "The Ellis Act is not intended to interfere with the police power of local governments to regulate land use. It is implicated only when the conditions or regulations sought to be imposed on a demolition permit would restrict a landlord's right to remove units from the rental market and leave the rental business." (59 Cal.App.4th at p. 1257.)

As a result of these cases, in 1999 the Legislature amended the Ellis Act to expressly state it is not intended to "[p]reempt local or municipal environmental or land use regulations, procedures, or controls that govern the demolition and redevelopment of residential property." (Gov. Code, § 7060.7, subd. (b).) The legislative history indicates these amendments to clarify the scope of the Ellis Act's reach were specifically directed at the holdings of *Javidzad, First Presbyterian,* and *Lincoln Place I,* among others. "Since the Ellis Act was adopted in 1986, a string of court decisions has undermined the compromise reached in Ellis between the rights of a property owner to remove rental units from the market and the ability of a local government to mitigate the effects of tenant displacement and to regulate the subsequent use of the property." (Sen. Housing & Community Development Com., Analysis of Sen. Bill No. 948 (1999–2000 Reg. Sess.) Apr. 5, 1999, Comments, para. 4.) The amendments to the Ellis Act "make[] it clear that local governments have authority to regulate the demolition of rental property and the authority to regulate the conversion of non-residential use following its withdrawal from rent or lease." (Sen. Housing & Community Development Com., 3d reading analysis of Sen. Bill No. 948 (1999–2000 Reg. Sess.) as amended Aug. 16, 1999, Comments, para. 3.)

## C. *CEQA.*

■ CEQA expressly declares that the maintenance of a quality environment for the people of the State of California is a matter of statewide concern. (Pub. Resources Code, § 21000, subd. (a); *Federation of Hillside & Canyon Associations v. City of Los Angeles* (2000) 83 Cal.App.4th 1252, 1258 [100 Cal.Rptr.2d 301].) The fundamental goals of environmental review

under CEQA are information, participation, mitigation, and accountability. (See Cal. Code Regs., tit. 14, § 15002; Remy et al., Guide to CEQA, California Environmental Quality Act (11th ed. 2006) p. 3.) In *Friends of Mammoth v. Board of Supervisors* (1972) 8 Cal.3d 247 [104 Cal.Rptr. 761, 502 P.2d 1049], the California Supreme Court interpreted CEQA for the first time, and concluded that CEQA should be interpreted so as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language. (*Friends of Mammoth*, at pp. 259, 262; see also *Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 112 [65 Cal.Rptr.2d 580, 939 P.2d 1280].)

■ At the "heart of CEQA" is the EIR. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights*).) An EIR is an informational document, and CEQA requires an EIR whenever there is substantial evidence supporting a fair argument that the proposed project[12] may produce significant environmental impacts. (Pub. Resources Code, § 21080, subd. (d); CEQA Guidelines,[13] § 15064, subd. (f)(1); *Goleta Union School Dist. v. Regents of University of California* (1995) 37 Cal.App.4th 1025, 1030 [44 Cal.Rptr.2d 110].)

An EIR must describe the proposed project and its environmental setting, state the objectives sought to be achieved, identify and analyze the significant effects on the environment, state how those impacts can be mitigated or avoided, and identify alternatives to the project, among other requirements. (Pub. Resources Code, §§ 21100, subd. (b), 21151; CEQA Guidelines, §§ 15124, 15125.) "The purpose of an environmental impact report is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project." (Pub. Resources Code, § 21061.) Ultimately, however, "[b]ecause the EIR must be certified or rejected by public officials, it is a document of accountability." (*Laurel Heights, supra*, 47 Cal.3d at p. 392.)

---

[12] Under CEQA, " 'Project' means the whole of an action, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment . . . ." (Cal. Code Regs., tit. 14, § 15378, subd. (a).)

[13] All references herein to the CEQA Guidelines are to California Code of Regulations, title 14, section 15000 et seq. developed by the Office of Planning and Research and adopted by the California Resources Agency. (Pub. Resources Code, §§ 21083, 21087.) "[C]ourts should afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA." (*Laurel Heights, supra*, 47 Cal.3d at p. 391, fn. 2.)

■ An agency may not approve a project that will have significant environmental impacts if there are feasible alternatives or feasible mitigation measures that would substantially lessen those effects. (Pub. Resources Code, §§ 21002, 21081, subd. (a); CEQA Guidelines, §§ 15002, subd. (a)(3), 15021, subd. (a)(2), 15091, subd. (a)(1).) A "mitigation measure" is a suggestion or change that would reduce or minimize significant adverse impacts on the environment caused by the project as proposed. (*No Slo Transit, Inc. v. City of Long Beach* (1987) 197 Cal.App.3d 241, 256 [242 Cal.Rptr. 760].) CEQA requires lead agencies[14] to include within EIR's potentially feasible alternatives that, if adopted, would avoid or substantially lessen the otherwise significant environmental effects of the proposed projects. In particular, mitigation measures should be capable of "[a]voiding the impact altogether by not taking a certain action or parts of an action"; "[m]inimizing impacts by limiting the degree or magnitude of the action and its implementation"; "[r]ectifying the impact by repairing, rehabilitating, or restoring the impacted environment"; "or [r]educing or eliminating the impact over time by preservation and maintenance operations during the life of the action." (CEQA Guidelines, § 15370.)

■ The Agency must "provide that measures to mitigate or avoid significant effects on the environment are fully enforceable through permit conditions, agreements, or other measures." (Pub. Resources Code, § 21081.6, subd. (b).) Thus, mitigation measures must be feasible and enforceable.[15] (*Federation of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1198 [24 Cal.Rptr.3d 543].) Although under Public Resources Code section 21004, "a public agency may exercise only those express or implied powers provided by law [other than CEQA]," in conjunction with CEQA, unrelated statutes may grant power to agencies to enforce mitigation measures. (CEQA Guidelines, § 15040, subds. (c), (d); see, e.g., *Golden Gate Bridge etc. Dist. v. Muzzi* (1978) 83 Cal.App.3d 707, 713 [148 Cal.Rptr. 197]; see also *Corona-Norco Unified Sch. Dist. v. City of Corona* (1993) 13 Cal.App.4th 1577, 1587 [17 Cal.Rptr.2d 236] ["CEQA is not an independent source of public agency power"].) "Public Resources Code section 21000 expresses the legislative intent that all 'public agencies which are found to affect the quality of the environment, shall regulate such activities so that major consideration is given to preventing environmental damage.' " (*Golden Gate Bridge etc. Dist. v. Muzzi, supra,* 83 Cal.App.3d at p. 713.)

---

[14] A "lead agency" is the agency that carries out a project or that has primary authority for approving a project, and thus which has the responsibility for conducting CEQA review. (Pub. Resources Code, § 21067; CEQA Guidelines, §§ 15050, 15051.)

[15] In this context, "feasible" means "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (Pub. Resources Code, § 21061.1.)

As part of the enforcement process, mitigation measures are subject to monitoring and reporting to ensure the measures will be implemented. (Pub. Resources Code, § 21081.6, subd. (a).) "The reporting or monitoring program shall be designed to ensure compliance during project implementation." (*Ibid.*) "The purpose of these [monitoring] requirements is to ensure that feasible mitigation measures will actually be implemented as a condition of development, and not merely adopted and then neglected or disregarded." (*Federation of Hillside & Canyon Associations v. City of Los Angeles, supra*, 83 Cal.App.4th at p. 1261, italics omitted.) The adequacy of a mitigation monitoring program is evaluated with the "rule of reason," a rule that requires that the mitigation measures be "reasonably feasible." (*Rio Vista Farm Bureau Center v. County of Solano* (1992) 5 Cal.App.4th 351, 380 [7 Cal.Rptr.2d 307]; see also *Christward Ministry v. County of San Diego* (1993) 13 Cal.App.4th 31, 48–49 [16 Cal.Rptr.2d 435] [upholding mitigation monitoring plan as complying with section 21081.6 that set out the stages of the project at which each mitigation measure should be implemented].)

### D. *The Subdivision Map Act.*

██ The Subdivision Map Act (Map Act)[16] regulates the subdivision of land and the granting and recordation of subdivision maps. The Map Act is designed to "encourage and facilitate orderly community development, coordinate planning with the community pattern established by local authorities, and assure proper improvements are made, so that the area does not become an undue burden on the taxpayer." (*Gomes v. County of Mendocino* (1995) 37 Cal.App.4th 977, 985 [44 Cal.Rptr.2d 93].) The Map Act does not "operate to defeat the legitimate exercise of the police power of a municipality in connection with matters outside the scope of the act and which are not calculated to circumvent its express provisions. . . . [W]hile the act may be the final word respecting the subdivision process, it does not purport and may not be understood to be preemptive of all land use regulation." (*McMullan v. Santa Monica Rent Control Bd.* (1985) 168 Cal.App.3d 960, 962–963 [214 Cal.Rptr. 617].)

██ The purpose of a conditional tentative map is to identify the requirements to which the developer must conform; the developer must demonstrate that he or she has fulfilled the conditions of the tentative map before approval of the final map will be given. (*Soderling v. City of Santa Monica* (1983) 142 Cal.App.3d 501, 505 [191 Cal.Rptr. 140] (*Soderling*); see also *Blue Chip Properties v. Permanent Rent Control Bd.* (1985) 170 Cal.App.3d 648, 661

---

[16] Government Code section 66410 et seq. and Public Resources Code section 21080, subdivision (a) provide that a tentative tract map is a "project" for purposes of CEQA.

[216 Cal.Rptr. 492] [tentative tract map approval guarantees developer who fulfills conditions final map approval].) The developer cannot record a final map if the conditions of a tentative map are not satisfied. (Gov. Code, § 66473 [where conditions not satisfied, local agency required to reject the final map]; see *Soderling, supra*, at p. 505.)

E. *AIMCO May Not Proceed with the Evictions Because They Are Contrary to the Mitigation Conditions (Conditions 5b and 13) of the VTT and the Evictions Are Not Saved by Resort to the Ellis Act.*

To support its actions under the Ellis Act, AIMCO principally argues that the mitigation conditions of the VTT relate to demolition permits and do not implicate the relocation provisions or its right to go out of the rental business under the Ellis Act. AIMCO also argues that because the VTT was not recorded, its conditions are not binding. We conclude that the mitigation conditions imposed on this project do not conflict with AIMCO's Ellis Act rights to go out of the rental business because (1) AIMCO agreed to those conditions when it sought approval of its VTT; (2) the mitigation conditions do not impermissibly burden AIMCO's right to go out of the rental business; and (3) the mitigation conditions, imposed under CEQA, fit within the Ellis Act's express exception for local land use and environmental regulations.[17]

1. *AIMCO Promised Not to Evict Tenants from Lincoln Place as a Condition of Approval of the VTT.*

Ellis Act jurisprudence concentrates on the landlord's right to go out of business, unfettered by local controls except for reasonable relocation assistance provisions that have been upheld, such as those promulgated under

---

[17] AIMCO contends that collateral estoppel bars plaintiffs' claims because this court, in *Lincoln Place II*, has already adjudicated that conditions 5b and 13 are not part of the conditions that the City must comply with before it can issue demolition permits. AIMCO points to the fact that this court refused to modify the opinion in *Lincoln Place II* to include these conditions as part of the contingencies required before demolition. This argument simultaneously misreads the scope of *Lincoln Place II* and the doctrine of collateral estoppel. The doctrine of collateral estoppel provides that a party to an action, or one in privity with a party, is barred from subsequently relitigating issues actually litigated and finally decided in a prior proceeding. (*United States Golf Assn. v. Arroyo Software Corp.* (1999) 69 Cal.App.4th 607, 615 [81 Cal.Rptr.2d 708].) The issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. (*Gikas v. Zolin* (1993) 6 Cal.4th 841, 849 [25 Cal.Rptr.2d 500, 863 P.2d 745].) *Lincoln Place II* did not address conditions 5b and 13 and their effect on demolition; as a result, *Lincoln Place II* has no bearing on our decision whether conditions 5b and 13 bar the evictions at issue here.

the RSO. AIMCO relies on this jurisprudence for its argument that it has complied with the mitigation conditions because it has provided what it considers to be relocation assistance that comports with the RSO and the very generous hiring of a "relocation specialist."[18] However, AIMCO's argument is misplaced because, long prior to its invocation of the Ellis Act, AIMCO agreed to additional mitigation above and beyond the RSO to ameliorate the tenants' displacement from their apartments, some of whom have lived at the Lincoln Place apartments for many years. Throughout the decade-long approval process and the many public hearings held in this matter, community opposition to the project was very vocal, and as a result, AIMCO and its predecessor promised, over and over, that "no tenant will be involuntarily displaced from Lincoln Place." Further, AIMCO promised, to gain approval of its project, that the tenants would receive the right of first refusal on new units, or would be relocated to comparable units at Lincoln Place while the 10-year project was phased in. As a result, the VTT provides that "[t]he Relocation Plan shall specify all operating details whereby existing households will be provided options for relocation, as follows: [¶] Accepting the applicant's offer to *relocate to a comparable or better vacant unit on site* . . . ."

By their nature, evictions are involuntary and hence are contrary to the mitigation conditions of the VTT. AIMCO has to date attempted to avoid the restrictions to which it agreed and which were necessary to mitigate the impact of the project, by emptying the units of their tenants. It convinced a majority of the tenants, who may have been unaware of the scope of conditions 5b and 13, to leave (in 2004 there were approximately 350 remaining) through its relocation packages. Once those tenants were gone, AIMCO commenced eviction proceedings against those tenants who refused to accept what it offered under the RSO, believing they were entitled to more. Nothing in the record shows any effort on AIMCO's part to offer to relocate the remaining tenants to other units in Lincoln Place while the project is being built, or that it intends to offer them first refusal rights when the new units in the project are built.

It is inaccurate and misleading to characterize the mitigation conditions as being nothing more than what the RSO guarantees. The language of the

---

[18] The RSO contains specific provisions for Ellis Act evictions. The landlord must (1) notify the City's department of housing of its intent to withdraw the unit, and (2) record with the county recorder a memorandum summarizing the provisions of the notice of intent to withdraw. The units may not be withdrawn sooner than 120 days from the date of delivery to the City of the notice of intent to withdraw, or if the tenant is 62 years or older and has lived in the unit at least one year, the unit may not be withdrawn for a period of one year. (L.A. Mun. Code, § 151.22.) In addition, the RSO requires a landlord evicting a tenant to provide relocation fees and relocation assistance. (L.A. Mun. Code, § 151.09, subd. (G) & (G)(1)(d).)

conditions that the tenants would be relocated to "another unit" does not refer to merely relocating the tenants off site as the RSO relocation provisions permit. The VTT's mitigation provisions evidence an intent that tenant displacement *from Lincoln Place* would be held to a minimum, and require no displacement in the absence of the tenants' voluntary agreement to leave. Throughout the approval process, tenants were told they could choose to remain on site; this promise is memorialized in conditions 5b and 13. Eviction is inconsistent with these provisions.

Furthermore, prior to commencing the evictions, AIMCO did not advise the City or the tenants that it intended to abandon the project; on the contrary, as its arguments concede, the evictions are a prelude to proceeding with the project. Its April 2005 letter to the remaining tenants evidences its continuing intent to proceed with the project: "The[] activists are saying that by signing up for the bonus [relocation] program you would lose your right of first refusal if AIMCO re-rented your unit. This is true, but irrelevant since AIMCO is tearing down all the buildings and is going out of the rental business on this entire property. . . ."

■ Had AIMCO's intent to proceed or the circumstances underlying the project changed, AIMCO could have sought to modify or delete the mitigation conditions if they had become impractical or unworkable. (*Lincoln Place II, supra*, 130 Cal.App.4th at p. 1508; see also *Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 358–359 [110 Cal.Rptr.2d 579].) As we suggested in *Lincoln Place II*, although *Napa Citizens* did not specify the procedure to follow in deciding whether a mitigation measure is no longer feasible, "because an initial determination a mitigation measure is infeasible must be included in the EIR and supported by substantial evidence it is logical to require a later determination a mitigation measure is infeasible be included in a supplemental EIR[19] and supported by substantial evidence." (*Lincoln Place II, supra*, 130 Cal.App.4th at p. 1509, fns. omitted.) However, there is no evidence in this record that AIMCO has sought to delete or modify the mitigation provisions of the VTT, or that they have become impractical or infeasible.

■ AIMCO's argument that it is not bound by the terms of the unrecorded VTT is unsupported by any authority. Nothing in the Map Act addresses the effect, or lack thereof, of an unrecorded map. On the other hand, the mitigation conditions and other conditions in the VTT constitute enforceable covenants under CEQA, to be fulfilled before the final map may

---

[19] See CEQA Guidelines sections 15162, 15163.

be recorded.[20] Thus, both statutory schemes operate in harmony to compel the conclusion that mitigation conditions are to be fulfilled before final maps may be recorded. AIMCO cannot attempt to defeat the conditions it imposed upon itself in order to obtain approval of the VTT by ignoring such conditions or attempting to render them meaningless by moving ahead with the project in spite of them. (See *Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1202–1203 [22 Cal.Rptr.3d 203].) Such conduct amounts to "piecemealing," a practice CEQA forbids. (*Lincoln Place II, supra*, 130 Cal.App.4th at p. 1507.) ██ "CEQA's requirements 'cannot be avoided by chopping up proposed projects into bite-size pieces which, individually considered, might be found to have no significant effect on the environment or to be only ministerial.' [Fn. omitted]." (*Ibid.*)

### 2. *The Mitigation Conditions Here Are Within the Ellis Act's Exception for Local Land Use and Environmental Controls.*

Under rules of statutory construction, we must construe CEQA and the Ellis Act together and harmonize them. (*Drouet v. Superior Court* (2003) 31 Cal.4th 583, 593 [3 Cal.Rptr.3d 205, 73 P.3d 1185].) The 1999 amendment to the Ellis Act clarifies that it does not "[p]reempt local or municipal environmental or land use regulations, procedures, or controls that govern the demolition and redevelopment of residential property." (Gov. Code, § 7060.7, subd. (b).) The Ellis Act also provides it does not diminish or enhance "any power which currently exists or which may hereafter exist in any public entity to grant or deny any entitlement to the use of real property, including, but not limited to, planning, zoning, and subdivision map approvals." (Gov. Code, § 7060.1, subd. (b).) The Ellis Act further exempts from its reach the power of "any public entity to mitigate any adverse impact on persons displaced by reason of the withdrawal from rent or lease of any accommodations." (Gov. Code, § 7060.1, subd. (c).)

In *Drouet v. Superior Court, supra*, 31 Cal.4th 583, the Supreme Court considered whether state statutes governing defenses that could be raised in unlawful detainer actions conflicted with the Ellis Act. *Drouet* held that the defense of retaliatory eviction set forth in Civil Code section 1942.5 may be asserted in an unlawful detainer action brought in an Ellis Act action. (31 Cal.4th at p. 593.)

In so doing, *Drouet* carefully balanced the competing interests of a tenant seeking to avoid a wrongful eviction brought under the guise of the Ellis Act

---

[20] AIMCO does not argue that the map is expired or that such expiration has any effect upon the VTT. (See Gov. Code, § 66452.6, subd. (d); *McPherson v. City of Manhattan Beach* (2000) 78 Cal.App.4th 1252, 1263 [93 Cal.Rptr.2d 725].)

with a landlord's bona fide intent to go out of the rental business under the Ellis Act, requiring the two statutes to be harmonized. We must do the same here with CEQA, which is made relevant here by the Ellis Act's explicit exceptions for a public entity's power to regulate, among other things, "planning," "subdivision map approvals," the "demolition and redevelopment of residential property," and the mitigation of adverse impacts on persons displaced by reason of the withdrawal of rental accommodations. Such items are the common focus and byproducts of the CEQA process, as they were in the case here. We therefore conclude that the Ellis Act does not preempt, and must be applied subject to, the mitigation conditions here.

### 3. *The Mitigation Conditions of the VTT Do Not Impermissibly Burden AIMCO's Right to Go Out of the Rental Business.*

The mitigation conditions of the VTT, to which AIMCO agreed, do not impermissibly burden its right to go out of the rental business because it may, upon completion of the conditions *to which it agreed*, exit such business with respect to the units at issue. The conditions permit the tenants to remain at Lincoln Place while the project is built out, are not particularly onerous, and do not preclude AIMCO from ultimately going out of the rental business at the site.[21]

We reject any argument that because AIMCO complied with the RSO's Ellis Act provisions and relocation benefits, it may go out of the rental business without reference to conditions 5b and 13 of the VTT. AIMCO specifically agreed to additional conditions in the VTT to mitigate the demolition of a very large apartment complex that had been part of the community for many years, the removal of more than 700 rent-controlled units from the marketplace, and the displacement of those tenants, in order to get permission to redevelop the land. It may not now act as if those events never occurred.

## II. *THE SCOPE OF THE UNLAWFUL DETAINER PROCEEDINGS IS INADEQUATE TO ADDRESS THE CEQA ISSUES HERE, AND A WRIT MUST ISSUE.*

Here, the trial court denied writ and injunctive relief on the grounds that the tenants could obtain the necessary relief by raising as defenses to eviction AIMCO's alleged noncompliance with the mitigation conditions. However, the court erred. The City, as the entity responsible for enforcement of the

---

[21] Technically, AIMCO is not "going out of the rental business" because it intends to offer rental units at the new project; it is only doing so with respect to the existing Lincoln Place complex.

mitigation conditions, is an indispensable party to any proceedings respecting the enforcement of the mitigation conditions of the VTT.

A. *The City Is Not a Party to the Unlawful Detainer Actions.*

 Unlawful detainer actions are necessarily expedited because of the limitations imposed on pleadings and issues that may be litigated. The only triable issue is the right to possession and incidental damages resulting from the unlawful detention. (*Underwood v. Corsino* (2005) 133 Cal.App.4th 132, 135 [34 Cal.Rptr.3d 542]; *Glendale Fed. Bank v. Hadden* (1999) 73 Cal.App.4th 1150, 1153 [87 Cal.Rptr.2d 102].) Affirmative defenses may be asserted only to the extent they might defeat the landlord's right to possession. (See, e.g., *Green v. Superior Court* (1974) 10 Cal.3d 616, 632–633 [111 Cal.Rptr. 704, 517 P.2d 1168] [warranty of habitability defense]; *Schweiger v. Superior Court* (1970) 3 Cal.3d 507, 517 [90 Cal.Rptr. 729, 476 P.2d 97] [retaliatory eviction]; *Minelian v. Manzella* (1989) 215 Cal.App.3d 457, 463–464 [263 Cal.Rptr. 597] [excessive rent in violation of rent control].)

The enforcement of the mitigation measures of the VTT does relate to the tenants' possessory rights to the units, because pursuant to the VTT, AIMCO may not evict them. However, determination of the enforceability of the mitigation measures under CEQA requires more than an evaluation of landlord-tenant law. Further, to address the CEQA issues, the City's joinder is required because it is the party responsible for enforcement of the CEQA mitigation measures. (Code of Civ. Proc., § 389, subd. (a); *Countrywide Home Loans, Inc. v. Superior Court* (1999) 69 Cal.App.4th 785, 791, 793–794 [82 Cal.Rptr.2d 63].) The introduction of these issues and an additional party into the proceedings would improperly and unnecessarily expand the scope of the summary unlawful detainer proceedings beyond mere issues of possession. (*Knowles v. Robinson* (1963) 60 Cal.2d 620, 625 [36 Cal.Rptr. 33, 387 P.2d 833].)[22]

B. *The Trial Court Is Directed to Issue a Writ and Injunction.*

 Where a public agency has failed to comply with CEQA, the trial court must (1) vacate the CEQA determination, finding or decision in whole or in part; (2) if the court finds that a specific project activity will prejudice the consideration and implementation of mitigation measures or project alternatives and could result in an adverse physical environmental change, mandate that the agency and any real party in interest suspend specific

---

[22] We note that although Government Code section 7060.6 provides that improper Ellis Act evictions may be challenged in an unlawful detainer proceeding, nothing in this statute provides that such proceedings are the only permissible venue for such a challenge.

activity until the agency complies with CEQA; (3) mandate that the agency take specific action necessary to comply with CEQA. (Pub. Resources Code, § 21168.9, subd. (a).) The court must specify what specific action by the agency is necessary to comply with CEQA (Pub. Resources Code, § 21168.9, subd. (b)), but cannot direct the agency to exercise its discretion in a particular way (Pub. Resources Code, § 21168.9, subd. (c)). (*Federation of Hillside & Canyon Associations v. City of Los Angeles, supra*, 83 Cal.App.4th at p. 1266.)[23]

Here, the City failed to enforce the mitigation conditions placed on the project when it failed to monitor whether the measures were being complied with, and when it permitted the Ellis Act notices to be filed without taking action to determine whether such notices were valid. At issue here is whether the City was enforcing the mitigation conditions, not whether it "approved" the Ellis Act notices. We therefore reject the City's contentions that it could not "approve" the Ellis Act notices because the RSO does not require it to do anything in response to such notices. As discussed above, the mitigation conditions imposed a greater duty on the City than to sit idly by while AIMCO improperly attempted to evict the tenants.

Further, the City argues that it had no notice that AIMCO was evicting the tenants, it had no mechanism by which to prevent AIMCO from evicting the tenants, it had no powers under CEQA to do anything, and that the VTT was "just a proposal" and not binding on anyone. These arguments find no support in this record, or in the law. First, the Ellis Act notices at the very least put the City on inquiry notice concerning the propriety of AIMCO's actions. Second, the City had the authority to enforce the mitigation measures through legal action to compel CEQA compliance. Finally, the VTT was more than a proposal; it was the document embodying the City's approval of the final EIR of the project and was the prelude to the recordation of the final tract map.

We reject the City's contention that the matter is moot. The City argues that the trial court can no longer grant the relief requested by

---

[23] The City and AIMCO contend the 180-day statute of limitations of Public Resources Code section 21167, subdivision (a) bars plaintiffs' action because it was commenced on June 8, 2006, more than 180 days after the March 18, 2005 Ellis Act notices. The statute's plain language demonstrates it has no application to this case seeking to enforce mitigation conditions: "An action or proceeding to attack, review, set aside, void, or annul the following acts or decisions of a public agency on the grounds of noncompliance with this division shall be commenced as follows: [¶] (a) An action or proceeding alleging that a public agency is carrying out or has approved a project that may have a significant effect on the environment without having determined whether the project may have significant effect on the environment shall be commenced within 180 days from the date of the public agency's decision to carry out or approve the project, or, if a project is undertaken without a formal decision by the public agency, within 180 days from the date of commencement of the project." (Pub. Resources Code, § 21167.)

petitioners because "[i]n the hope of precluding an unnecessary appeal, the trial court sweepingly declared the rights of tenants to assert as an affirmative defense in any action by AIMCO to recover possession the landlord's failure to satisfy relocation assistance conditions," and the judgment of the trial court "declares *with finality* that the tenants of Lincoln Place have all of the protections against evictions without relocation assistance which they sought to obtain through writ of mandate." The City misconstrues the mootness doctrine; a final judgment does not render an issue moot. Rather, a case becomes moot when a court ruling can have no practical effect or cannot provide the parties with effective relief. (*Californians for Alternatives to Toxics v. Department of Pesticide Regulation* (2006) 136 Cal.App.4th 1049, 1069 [39 Cal.Rptr.3d 393].) Here, nothing in the unlawful detainer proceedings can or will resolve the issue of CEQA compliance; therefore, this court's ruling will have a practical effect on compliance with the mitigation conditions and provide relief to the tenants.

We need not reach petitioners' unfair competition law claims to determine that the evictions must be enjoined. As discussed above, consistent with CEQA and the Ellis Act, AIMCO may not evict the tenants without first complying with the mitigation conditions of the EIR. Therefore, petitioners are entitled to injunctive relief and the trial court is directed on remand to enjoin the unlawful detainer proceedings.[24]

## DISPOSITION

The judgment of the superior court is reversed. The superior court is directed to grant the plaintiffs' petition for writ of mandate, and enter judgment against the City, compelling it to enforce the mitigation provisions of the EIR. In addition, the superior court is directed to enter an injunction

---

[24] AIMCO insists that its Ellis Act notices are insulated from liability because the acts of filing such notices are statements related to the litigation, and are required before it can commence unlawful detainer proceedings. (See Civ. Code, § 47, subd. (b)(2).) AIMCO over-reads the scope of the litigation privilege. It is not intended to insulate all wrongful *conduct* from liability merely because it is undertaken in the context of litigation. Rather, the litigation privilege applies " 'to any publication required or permitted by law in the course of a judicial proceeding to achieve the objects of the litigation, even though the publication is made outside the courtroom and no function of the court or its officers is involved.' " (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1057 [39 Cal.Rptr.3d 516, 128 P.3d 713], quoting *Silberg v. Anderson* (1990) 50 Cal.3d 205, 212 [266 Cal.Rptr. 638, 786 P.2d 365].) The principal purpose of the litigation privilege "is to afford litigants and witnesses . . . the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions." (*Silberg v. Anderson, supra,* 50 Cal.3d at p. 213, citation omitted.) Hence, while the actual filing of the Ellis Act notices may be protected by the litigation privilege, *the legal effect* of the notices is not and plaintiffs may challenge whether the Ellis Act permits the evictions here.

enjoining AIMCO from evicting any of the current remaining Lincoln Place tenants unless and until the mitigation conditions are complied with or amended in compliance with applicable law.

Johnson, Acting P. J., and Woods, J., concurred.

A petition for a rehearing was denied October 10, 2007, and the opinion was modified to read as printed above. The petition of respondent AIMCO Venezia LLC for review by the Supreme Court was denied December 12, 2007, S157085.