[No. B218275. Second Dist., Div. One. Dec. 21, 2010.]

AZUSA LAND PARTNERS, Plaintiff and Appellant, v.
DEPARTMENT OF INDUSTRIAL RELATIONS, Defendant and
Respondent.

2

6

**COUNSEL**

Allen Matkins Leck Gamble Mallory & Natsis, Patrick A. Perry and Nancy S. Fong for Plaintiff and Appellant.

Paskerian Block Martindale & Brinton, Robin C. Martindale and Caleb J. Brinton IV for Rancho Mission Viejo as Amicus Curiae on behalf of Plaintiff and Appellant.

Cox, Castle & Nicholson, John S. Miller, Jr., and Dwayne P. McKenzie for California Building Industry Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Vanessa L. Holton, Anthony Mischel and Christopher Jagard for Defendant and Respondent.

**OPINION**

**JOHNSON, J.**—Azusa Land Partners (ALP) appeals from a judgment denying its petition for writ of mandate. (Code Civ. Proc., § 1085.) ALP seeks to vacate a determination by respondent Department of Industrial Relations (Department) that a planned community project is a "public work," as defined

by Labor Code section 1720,[1] and subject to prevailing wage laws applicable to public improvement work performed by private contractors as a condition of regulatory approval for their construction projects. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*Factual background*

Petitioner and appellant ALP is the owner and developer of a master planned community known as the "Rosedale Project" (Project). The Project is located on over 500 acres of land in the City of Azusa (City) previously owned by the Monrovia Nursery Company (Monrovia Nursery), ALP's predecessor in interest. The Project involves the potential development of over 1,200 homes, about 50,000 square feet of commercial construction, and public infrastructure and improvement work. To obtain approval for the Project, Monrovia Nursery agreed to conditions imposed by the City to perform certain public infrastructure and improvement work, including the construction of a public school and adjoining park, freight undercrossings, sanitation district facilities, and backbone and in-tract street, bridge, storm drain, sewer, water/reservoir, dry utilities, park and landscaping improvements for the Cities of Glendora and Azusa. These conditions are memorialized in a May 27, 2004 development agreement between the City and Monrovia Nursery.

In August 2005, the City and ALP entered into a funding and acquisition agreement (Acquisition Agreement), to provide for partial funding of required public facilities through Mello-Roos bonds (Mello-Roos Community Facilities Act of 1982; Gov. Code, § 53311 et seq.). Pursuant to the Acquisition Agreement, the City agreed to establish a community facilities district to sell special (Mello-Roos) tax bonds to be used to pay for the design, planning, engineering, installation and construction of certain facilities eligible for public financing (the Eligible Facilities). ALP was to construct the Eligible Facilities, which would be owned, operated and maintained by the City of Azusa or Glendora, the Azusa Unified School District or the Los Angeles

---

[1] Statutory references are to the Labor Code, unless otherwise indicated, and undesignated references to particular subdivisions are to subdivisions of section 1720.

County Metropolitan Transportation Authority, pursuant to a series of agreements (the Funding Agreements) between ALP and these public entities.[2] The Eligible Facilities are identified in exhibit A to the Acquisition Agreement.

The Funding Agreements refer to "Publicly Financed Facilities," as the subset of Eligible Facilities which will actually be built using proceeds of Mello-Roos bonds. According to ALP, the Publicly Financed Facilities were not identified in the Acquisition Agreement because it was not known at the time that agreement was executed specifically which Eligible Facilities would be constructed using Mello-Roos bonds. The Publicly Financed Facilities were subsequently identified in a modification to the Acquisition Agreement (exhibit B), executed between the City and ALP in 2007, after the Mello-Roos bonds were issued.

On June 5, 2006, after consolidated special elections, the City authorized the creation of Community Facilities District No. 2005-1, Rosedale (CFD), approved a bond indebtedness of up to $120 million to be incurred by the CFD, and authorized the city clerk to record a notice of a special tax lien on real property located within the CFD.[3] The county collects special taxes in the same manner as ad valorem property taxes, and the proceeds are transferred to CFD's fiscal agent, Wells Fargo Bank. All public infrastructure and facilities required as a condition of approval of the Project (the Eligible Facilities) were eligible for CFD funds. The fiscal agent distributes the funds. The city manager and finance director must approve payment to ALP of any Mello-Roos bond proceeds.

Under the Acquisition and Funding Agreements, ALP is obligated to perform the public improvement work required by the City as a condition of approval of the Project even if the actual cost of that infrastructure construction exceeds the amount of bond funds authorized to pay for the public improvement work performed. That scenario has been borne out. The total cost of construction of all the Eligible Facilities is approximately $146 million. The CFD issued approximately $71 million in Mello-Roos bonds, the proceeds of which were used to fund construction of the Publicly Financed Facilities. The remaining $76 million in required public improvements must be constructed at private expense.

---

[2] Specifically, the Funding Agreements are comprised of the:
(1) Acquisition Agreement;
(2) Joint community facilities agreement by and among the Cities of Azusa and Glendora and ALP;
(3) Joint community facilities agreement by and among the City, Los Angeles to Pasadena Metro Blue Line Construction Authority, and ALP; and
(4) Joint community facilities agreement by and among the City, ALP and Azusa Unified School District.

[3] The CFD was established under the authority of the Mello-Roos Community Facilities Act of 1982, Government Code section 53311 et seq. (the Mello-Roos Act).

*Administrative proceeding*

In October 2005, an administrative inquiry was filed requesting the Department to investigate and issue a determination as to whether the entire Project constituted a "public work" under section 1720, subject to the prevailing wage mandates of section 1771.[4] In response, ALP argued the Project was not a public work, but simply a private development project as to which the City lacked a proprietary interest, but as to which it required construction of certain public improvements as a condition of approval. ALP also asserted that although it was obligated and intended to pay prevailing wages for the public improvements actually financed with the proceeds of Mello-Roos bonds, it was not required to do so for the construction of any infrastructure improvement for which it did not receive Mello-Roos financing.

In October 2007, the Department issued a public works coverage determination (Determination). The Determination found that the entire Project constituted a public work within the meaning of section 1720, subdivision (a)(1). According to the Determination, payment of Mello-Roos bond proceeds to ALP, a private developer, for the construction of public facilities and infrastructure improvements constituted a payment of public funds. (§ 1720, subd. (b)(1).) Because the Project was funded, in part, through public funds, it satisfied the definition of a "public work" under subdivision (a)(1). However, the Determination also found the Project satisfied the exemption of subdivision (c)(2), which provides that only those public infrastructure improvements required as a condition of regulatory approval are subject to the prevailing wage requirements, so long as the public funds contributed to the Project do not exceed the cost of construction of the required public improvements. Accordingly, the Determination held that ALP was required to comply with prevailing wage laws only as to that portion of the Project involving construction of public improvements required as a condition of the City's approval of the Project.

ALP filed an administrative appeal as to the portion of the Determination that held that all public infrastructure improvements required as a condition of approval are subject to prevailing wage requirements, even if those improvements are not funded through the proceeds of Mello-Roos bonds.

In July 2008, the Department affirmed its initial Determination by a decision on administrative appeal. The decision held that (1) the proceeds of

---

[4] The inquiry was initiated by the Southern California Labor/Management Operating Engineers Contract Compliance Committee, a joint committee of labor and management. The inquiry was initiated pursuant to California Code of Regulations, title 8, section 16001, subdivision (a), which permits any "interested party" to request an investigation. The committee is not a party to this action.

the Mello-Roos bonds are public funds for purposes of the prevailing wage law; (2) because the Project is partially funded using proceeds of Mello-Roos bonds, the entire Project is a public work; (3) the cost of the portion of the Project funded by proceeds from the Mello-Roos bonds did not exceed the cost of construction of all public infrastructure improvements required as a condition of regulatory approval of the Project; and (4) all public infrastructure improvements are subject to the requirement of payment of prevailing wages, whether or not constructed using public funds.

*Proceedings in the trial court*

In October 2008, ALP filed the instant petition seeking a writ of mandate (Petition).[5] (Code Civ. Proc., § 1085.) Following substantial briefing and two lengthy hearings, the trial court denied the Petition. The court agreed with the Department's decision. It found that (1) Mello-Roos bond proceeds are public funds; (2) the Project is a "public work" within the meaning of subdivision (a)(1); and (3) under subdivision (c)(2), all public improvement work required as a condition of regulatory approval is subject to the prevailing wage law, not merely those discrete portions of public improvement work performed on the Project actually paid for with public funds. The court rejected ALP's assertion that subdivisions (a)(1) and (c)(2) need not even be analyzed because subdivision (a)(2), which applies to public work performed for an "improvement district[]" (i.e., the CFD), is more specific and on point and, under that subdivision, only those public improvements actually funded by the proceeds of Mello-Roos bonds are public works.

Judgment was entered in favor of the Department. ALP appeals.[6]

## DISCUSSION

This appeal raises three questions. We must determine whether (1) the trial court erred by conducting its analysis under section 1720, subdivision (a)(1), rather than subdivision (a)(2); (2) the proceeds of Mello-Roos bonds are "public funds," under section 1720; and (3) if Mello-Roos bonds are "public funds," all construction of public improvements required as a condition of

---

[5] ALP also filed a complaint for declaratory and injunctive relief; the Department demurred. The demurrer was sustained without leave to amend as to a "cause of action" for an injunction, and with leave to amend as to a claim for declaratory relief. ALP did not amend its pleading. Only the claim for administrative mandate remains at issue.

[6] We granted leave to the California Building Industry Association (CBIA) and to Rancho Mission Viejo (RMV) to participate as amici curiae in support of ALP. (When mentioned in conjunction with one another, and with respect to positions on which they agree with each other or ALP, we will refer to CBIA and RMV, collectively, as amici curiae.) CBIA's motion for judicial notice is denied. The matters for which notice is sought are not relevant to our disposition.

regulatory approval is subject to prevailing wage law, including public infrastructure constructed at private expense.

### 1. *Standard of review*

"In conducting our review, we must exercise our independent judgment in resolving whether the project at issue constituted a 'public work' within the meaning of the [prevailing wage law]." (*City of Long Beach v. Department of Industrial Relations* (2004) 34 Cal.4th 942, 949 [22 Cal.Rptr.3d 518, 102 P.3d 904] (*Long Beach*), citing *McIntosh v. Aubry* (1993) 14 Cal.App.4th 1576, 1583–1584 [18 Cal.Rptr.2d 680] (*McIntosh*).) Where, as here, the facts are undisputed, and the purely legal issues involve the interpretation of a statute an administrative agency is responsible for enforcing, we exercise our independent judgment, "taking into account and respecting the agency's interpretation of its meaning." (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7–8 [78 Cal.Rptr.2d 1, 960 P.2d 1031]; see *State Building & Construction Trades Council of California v. Duncan* (2008) 162 Cal.App.4th 289, 304 [76 Cal.Rptr.3d 507] (*Duncan*).) The agency's interpretation is " 'one of several interpretive tools that may be helpful. In the end, however, "[the court] must . . . independently judge the text of the statute." ' [Citation.]" (*Long Beach,* at p. 951; see also *Williams v. SnSands Corp.* (2007) 156 Cal.App.4th 742, 753 [67 Cal.Rptr.3d 606] [administrative agency's interpretation does not bind judicial review, but it is entitled to consideration and respect].)

### 2. *California's prevailing wage law, and Mello-Roos bond financing*

#### a. *Prevailing wage law*

California's prevailing wage law (PWL) (§§ 1720–1861) was enacted in 1931, contemporaneous with enactment of its federal counterpart, the Davis-Bacon Act (codified at 40 U.S.C. §§ 3141–3148). Prevailing wage laws were enacted in response to economic conditions resulting from the Great Depression, when the oversupply of labor due to the virtual cessation of private construction was exploited by unscrupulous contractors to win government contracts. (See *Universities Research Assn. v. Coutu* (1981) 450 U.S. 754, 774 [67 L.Ed.2d 662, 101 S.Ct. 1451].)

■ It is the expressly stated legislative policy in California "to vigorously enforce minimum labor standards in order to ensure employees are not required or permitted to work under substandard, unlawful conditions or for employers that have not secured the payment of compensation, and to protect employers who comply with the law from those who attempt to gain a competitive advantage at the expense of their workers by failing to comply

with minimum labor standards." (§ 90.5, subd. (a); see also § 90.3.) Several specific goals are subsumed within this general objective: " 'to protect employees from substandard wages that might be paid if contractors could recruit labor from distant cheap-labor areas; to permit union contractors to compete with nonunion contractors; to benefit the public through the superior efficiency of well-paid employees; and to compensate nonpublic employees with higher wages for the absence of job security and employment benefits enjoyed by public employees. [Citations.]' (*Lusardi* [*Construction Co. v. Aubry* (1992)] 1 Cal.4th [976,] 987 [4 Cal.Rptr.2d 837, 824 P.2d 643].)" (*Long Beach, supra*, 34 Cal.4th at p. 949; see also *Duncan, supra*, 162 Cal.App.4th at p. 295.) " 'The overall purpose of the prevailing wage law is to protect and benefit employees *on public works projects.* [Citation.]' " (*Long Beach*, at p. 949.) The PWL is a minimum wage law. (*Reyes v. Van Elk, Ltd.* (2007) 148 Cal.App.4th 604, 612 [56 Cal.Rptr.3d 68].) As such, it is liberally construed to further its purpose. (*Long Beach*, at p. 950.)

■ The PWL is fairly straightforward in operation. Subject to exceptions not relevant here, prevailing wages must be paid for "construction work" on "public works" projects of $1,000 or more. (§§ 1771, 1771.5, 1771.55, 1771.7, 1771.75, 1771.8, 1771.9.) "Public works" are broadly defined. They include "[c]onstruction, alteration, demolition, installation, or repair work done under contract and paid for in whole or in part out of public funds, . . . [and] . . . work performed during the design and preconstruction phases of construction . . . ." (§ 1720, subd. (a).) The project may involve privately owned property that will remain in private hands, but which will be leased to the state or a political subdivision. (§ 1720.2.) Prevailing wage requirements do not apply to work done by a public agency's own employees. (§ 1771.)

■ The director of the Department has the responsibility to determine the general prevailing wage according to statutory criteria. (§ 1770.) The prevailing wage rates are fixed for each category of worker on a public works project, and those rates are used by public entities soliciting bids for the project. (§§ 1773, 1773.2.) The Department is vested with authority to render opinions as to whether "a specific project or type of work" requires compliance with the PWL. (Cal. Code Regs., tit. 8, § 16001, subd. (a)(1); see *Lusardi Construction Co. v Aubry, supra*, 1 Cal.4th at pp. 988–989 (*Lusardi*).) The ramifications for developers, contractors and others who find themselves in violation of the PWL are significant: they may be subject to prevailing wage and penalty assessments and fines, disciplinary action, claims and/or suits by unpaid workers (§§ 1194, subd. (a), 1741, 1742.1, subd. (a), 1774, 1775), claims by contractors whose bids are rejected and who suffer damages from submitting bids that are not accepted due to the successful bidder's violation of the PWL (e.g., the second lowest bidder on a public works project), criminal prosecution (§§ 23, 1750, 1777), and willful or repeat violators may be barred from bidding or working on public works projects for up to three

years. (§ 1777.1, subds. (a), (b); see *Duncan, supra,* 162 Cal.App.4th at p. 296; *Road Sprinkler Fitters Local Union No. 669 v. G & G Fire Sprinklers, Inc.* (2002) 102 Cal.App.4th 765, 775–779 [125 Cal.Rptr.2d 804]; *Violante v. Communities Southwest Development & Construction Co.* (2006) 138 Cal.App.4th 972, 979 [41 Cal.Rptr.3d 673].)

The overarching issue before us is whether the Project constitutes a "public work" following the enactment of Senate Bill No. 975 (2001–2002 Reg. Sess.) in 2001, which amended section 1720, and how broadly the prevailing wage obligations apply to the Project. If section 1720 is considered straight-forward in operation, analytically, it is anything but. As one court aptly said, the statute "is hardly a triumph of the drafter's art." (*Duncan, supra,* 162 Cal.App.4th at p. 308.) The analysis of section 1720, to determine whether a particular construction project constitutes a "public work" subject to the prevailing wage requirements, "starts with subdivision (a), which defines 'public works' " to mean construction " 'done under contract' and 'paid for in whole or in part out of public funds,' " and subdivision (b), which enumerates what is meant by the latter clause. (162 Cal.App.4th at p. 309.) Each portion of the definition must be assessed. At the outset, *Duncan* observed that the word "means," as used in section 1720 subdivisions (a) and (b), is "one of limitation, not enlargement." (162 Cal.App.4th at p. 309.) Subdivision (c), a "true hodgepodge," specifies a number of situations that may be excluded or exempted from subdivision (a)(1)'s " 'paid for in whole or in part' " out of public funds "depending on the circumstances." (162 Cal.App.4th at pp. 309–310.)

■ Judicial construction of section 1720 is not accomplished by examining bits and pieces of a statute, but only after a consideration of all of its parts in order to effectuate the Legislature's intent. (*Duncan, supra,* 162 Cal.App.4th at p. 310; *Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737 [21 Cal.Rptr.3d 676, 101 P.3d 563].) "In the rare case, widening the analytical aperture brings additional difficul-ties: 'Statutory language which seems clear when considered in isolation may in fact be ambiguous or uncertain when considered in context.' [Citation.]" (*Duncan,* at p. 310.) This is one of those cases. We cannot look at the provisions of section 1720 individually, because various subdivisions address the same subject, namely, what is meant by "construction" as it relates to the subdivision (b) definition of what constitutes a public work "paid for in whole or in part out of public funds," and how much of the work performed is subject to prevailing wage requirements.

b. *Section 1720*

 Under the PWL, "prevailing wages" must be paid to nongovernment employees employed on "public works" performed by private contractors. (§ 1771.) "Public works" are defined in pertinent part in section 1720, subdivision (a) as:

"(1) Construction, alteration, demolition, installation, or repair work done under contract and *paid for in whole or in part out of public funds* . . . . For purposes of this paragraph, 'construction' includes work performed during the design and preconstruction phases of construction including, but not limited to, inspection and land surveying work.

"(2) Work done for irrigation, utility, reclamation, and *improvement districts*, and other districts of this type. . . .

"(3) Street, sewer, or *other improvement work* done under the direction and supervision *or by the authority* of any officer or public body of the state, or of any political subdivision or district thereof . . . ."[7] (Italics added.)

Under section 1720, subdivision (b), "paid for in whole or in part out of public funds" is defined as all of the following:

"(1) The payment of money or the equivalent of money by the state or political subdivision directly to or on behalf of the public works contractor, subcontractor, or developer.

"(2) Performance of construction work by the state or political subdivision in execution of the project.

"(3) Transfer by the state or political subdivision of an asset of value for less than fair market price.

"(4) Fees, costs, rents, insurance or bond premiums, loans, interest rates, or other obligations that would normally be required in the execution of the contract, that are paid, reduced, charged at less than fair market value, waived, or forgiven by the state or political subdivision.

"(5) Money loaned by the state or political subdivision that is to be repaid on a contingent basis.

"(6) Credits that are applied by the state or political subdivision against repayment obligations to the state or political subdivision."

---

[7] Subdivision (a)(4) to (6), relates to the laying of carpet and public transportation projects.

Subdivision (c) specifies the situations that may be excluded—or included—from the definition of "paid for in whole or in part out of public funds." One exception is relevant here. It states: "(2) If the state or a political subdivision requires a private developer to perform construction, alteration, demolition, installation, or repair work on a public work of improvement as a condition of regulatory approval of an otherwise private development project, and the state or political subdivision contributes no more money, or the equivalent of money, to the overall project than is required to perform this public improvement work, and the state or political subdivision maintains no proprietary interest in the overall project, then only the public improvement work shall thereby become subject to this chapter."

### c. Mello-Roos bond financing

■ We adopt the trial court's succinct description of the purpose and application of the Mello-Roos Act. "The Mello-Roos Act (Gov. Code, § 53311 et seq.) was promulgated to provide an alternative for financing public facilities in developing areas. Any local agency may establish a CFD to provide for and finance the cost of eligible public facilities. Subject to approval of a 2/3 vote of the electorate in the CFD, a local agency may issue bonds for the CFD and may levy and collect a special tax within the CFD to pay the bonds. The city council acts as the legislative body of the CFD. The city has the obligation to pay the principal and interest on each of the bonds issued. The bonds are considered 'special obligations of the city payable solely from net special tax revenues . . . .' [Citation.] The tax is levied against the real property within the CFD's geographic boundaries. [Citation.] Although unpaid taxes constitute a lien on the real property, they do not constitute a personal indebtedness of any landowner, the developer, or any future property owner. When the developer sells the individual parcels of land that have been developed into homes, the tax obligation shifts from the developer to the home owner; the developer is under no further obligation to pay taxes on that property. The special tax is collected by the county treasurer-tax collector in the same manner as ad valorem property taxes, and the proceeds are transferred to the CFD's fiscal agent. [Citation.] The fiscal agent then distributes the tax money as specified by the various funding agreements. [Citation.]" "The Mello-Roos Act was enacted for the express purpose of providing 'an alternative method of financing certain public capital facilities and services, especially in developing areas and areas undergoing rehabilitation.' (Stats. 1982, ch. 1439, § 1, p. 5486.)" (*Friends of the Library of Monterey Park v. City of Monterey Park* (1989) 211 Cal.App.3d 358, 376 [259 Cal.Rptr. 358].)

Against this statutory backdrop, we turn first to ALP's argument that section 1720, subdivision (a)(2) is the controlling provision for purposes of determining how much of the Project is subject to the PWL.

### 3. *The determination under section 1720, subdivision (a)(1) does not render subdivision (a)(2) superfluous.*

The trial court found the entire Project was a "public work," i.e., construction done under contract and "paid for in whole or in part out of public funds," because some portion of the Project is publicly funded using proceeds of Mello-Roos bonds. ALP maintains this interpretation of section 1720, subdivision (a)(1) renders subdivision (a)(2) superfluous. ALP insists only those portions of the Project performed for and paid for by the CFD constitute public works subject to the prevailing wage law. Specifically, ALP argues subdivision (a)(2) defines "public works" as "[w]ork done for irrigation, utility, reclamation, and *improvement districts*, and other districts of this type." Some infrastructure work performed by ALP on the Project (the Publicly Financed Facilities) was paid for with proceeds from Mello-Roos bonds issued by the CFD. The CFD is an improvement district.[8] Therefore, ALP is subject to the requirements of the PWL as to, but only as to, the public improvement work actually performed for the CFD. According to this logic, one need not even look to subdivision (a)(1) to analyze whether the entire Project is a "public work" under subdivision (a)(1), because subdivision (a)(2) is directly on point and controls the analysis.

 This argument is flawed. First, ALP equates the statute's requirement that infrastructure work have been "done for" an improvement district, with a requirement that the work must also have been "paid for" by the improvement district. The equivalence is not warranted. In contrast to other provisions at section 1720, each of which explicitly refers to work "paid for" with public funds, subdivision (a)(2) contains no requirement that an improvement district have paid for the work performed on its behalf. (See § 1720, subd. (a)(1), (4) & (5).) We are not at liberty to insert into the statute a term the Legislature chose to omit. Its absence cannot be assumed to be

---

[8] ALP assumes, without discussion, that the CFD is an "improvement district" as that term is used in subdivision (a)(2). The Department (and CBIA) contend it is at least possible that the Legislature did not intend for CFD's to be included within the definition of "improvement districts" in subdivision (a)(2) because the language of the PWL predates passage of the Mello-Roos Act. The term "improvement district" is not defined by section 1720, and no legislative history guides our determination. Nevertheless, we presume the Legislature is aware of existing laws when it enacts legislation. (*Voss v. Superior Court* (1996) 46 Cal.App.4th 900, 925 [54 Cal.Rptr.2d 225].) Thus, we must conclude that the Legislature was aware that section 1720, subdivision (a)(2) referred to "improvement districts" when it enacted the Mello-Roos Act. Had the Legislature meant to exclude CFD's from treatment as improvement districts it could have done so, either in the Mello-Roos Act, or by amending the PWL. It did neither. A CFD is a " 'legally constituted governmental entity established for the purpose of carrying on specific activities within definitely defined boundaries' [citation] empowered to impose special taxes to pay for specified services and facilities within the district." (*Friends of the Library of Monterey Park v. City of Monterey Park, supra*, 211 Cal.App.3d at p. 376.) As such, and without more, we are not persuaded they should be excluded from coverage under the PWL.

without meaning. " ' "[W]hen the Legislature has carefully employed a term in one place and has excluded it in another, it should not be implied where excluded." ' " (*Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1118 [29 Cal.Rptr.3d 262, 112 P.3d 647]; see *Duncan, supra,* 162 Cal.App.4th at p. 312; 2A Singer & Singer, Sutherland Statutes and Statutory Construction (7th ed. 2007) § 46:6, pp. 251–252).)

Second, ALP's argument ignores that the CFD, an independent governmental entity, was initially formed and specifically authorized to facilitate the funding, design, engineering, installation and construction of the public infrastructure and improvements (the Eligible Facilities) required as a condition of governmental approval of the entire Project. The phrase "[w]ork done for" in subdivision (a)(2) includes all the infrastructure work performed for the CFD and required by the City as a condition of its approval of the Project, not merely the work for which ALP received funding through the CFD. ALP cannot rely on the January 2007 contractual amendment (exhibit B) to the Acquisition and Funding Agreements, which specifies the subset of the eligible facilities actually paid for using proceeds from Mello-Roos bonds, to reduce or limit its obligation to pay prevailing wages on all the public improvement works. If the requirement that prevailing wages be paid on public works projects obtains, the duty flows from a statutory obligation. It may not be limited or eliminated by contract. (*Lusardi, supra,* 1 Cal.4th at pp. 987–988; see also §§ 1773.2, 1775, 1776, subd. (g), 1777.)

█ Also, not all of subdivision (a)(2) is subsumed within subdivision (a)(1). Although the type of governmental entity for whom the infrastructure work may be performed under subdivision (a)(2) is more limited than the entities for whom work may be done under subdivision (a)(1), the range of tasks covered by (a)(2) is broader. Subdivision (a)(1) requires that (1) construction, alteration, demolition, installation or repair work be performed, (2) "under contract" (i.e., not by the public entity's own employees), and (3) the work be paid for wholly or in part out of public funds. Subdivision (a)(2) has no similar limitation as to the type of work that may be performed for improvement districts.[9] For example, "maintenance" work would constitute public work covered by subdivision (a)(2), but would not be encompassed by the enumerated categories of work identified in subdivision (a)(1). Conversely, the broad range of tasks encompassed within subdivision (a)(2) may only be performed for specific types of entities, i.e., irrigation, utility, reclamation and

---

[9] Subdivision (a)(2) exempts from the definition of "public work" the day-to-day operations of certain entities. The exemption is not relevant here.

improvement districts, and the like. Subdivision (a)(1) contains no similar limitation, so long as the permitted tasks are done under contract and receive at least partial public funding.[10]

■ *Reclamation Dist. No. 684 v. Department of Industrial Relations* (2005) 125 Cal.App.4th 1000 [23 Cal.Rptr.3d 269] (*Reclamation District*) illustrates this point. There, the court found that placement of fill on a levee (maintenance work) was subject to prevailing wage requirements. Section 1771 requires payment of prevailing wages on public works, and expressly applies to contracts for maintenance work. Section 1720, subdivision (a)(2) exempts the operations of an irrigation or reclamation district from the definition of "public work." But the work performed in *Reclamation District* was periodic maintenance. Such work was not related to the operation of an irrigation or drainage system of an irrigation or reclamation district, the only sort of work exempt under subdivision (a)(2). (*Reclamation District*, at pp. 1005–1006.) Under subdivision (a)(2)'s broader definition, all work done for an improvement district—even that which would not be covered by the narrower categories listed in subdivision (a)(1)—is "public work." Under this reasoning, with which we concur, subdivision (a)(2) may apply independently to cover some work for an improvement district not otherwise encompassed within subdivision (a)(1)'s enumerated categories. Accordingly, ALP's assertion that application of subdivision (a)(1) would necessarily subsume application of subdivision (a)(2) does not withstand scrutiny. ALP's argument that subdivision (a)(2) must apply because it is "more specific" to the circumstances at issue rests on the rule of statutory construction that a specific provision relating to a particular subject will govern as against a more general provision relating to a similar subject. (*Shewry v. Wooten* (2009) 172 Cal.App.4th 741, 747 [91 Cal.Rptr.3d 199].) But that principle does not apply where, as here, we are called upon to interpret and construe statutory language in the context of an overall statutory scheme. "We do not construe statutes in isolation, but rather read each statute with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain its effectiveness. . . . [W]e will choose the construction that comports most closely with the Legislature's apparent intent, and endeavor to promote

---

[10] Similarly, unlike subdivision (a)(1), subdivision (a)(2) does not require a payment of public funds. It may apply to work that results from an exchange of tax credits, a fee reduction, or the transfer of an asset for less than market value, all of which fall within the definition of " 'paid for in whole or in part out of public funds' " under subdivision (b). (§ 1720, subd. (b)(3), (4) & (6).) ALP dismisses such examples as merely "hypothetical or conjured up scenario[s]." This cursory dismissal is misguided in light of the fact that the focus of the parties and amici curiae is how section 1720 should be interpreted, giving effect to each provision and reading each in context of the statutory scheme of which it is a part. That determination cannot be made, nor can we assess the merits of ALP's contention that subdivision (a)(2) trumps (a)(1), without necessarily considering whether there is, as ALP asserts, no circumstance in which work performed for an improvement district might fall within one subdivision, but not another.

rather than defeat the statute's general purpose, and avoid a construction that would lead to absurd consequences." (*Lincoln Place Tenants Assn. v. City of Los Angeles* (2007) 155 Cal.App.4th 425, 440 [66 Cal.Rptr.3d 120].)

We reject ALP's invitation to parse the language of subdivision (a)(2) in isolation, disregarding the other subdivisions of section 1720 and the context of the overall statutory scheme to which it belongs. "Labor Code section 1720 embodies the longstanding public policy of California to require employers engaged on public works projects to pay the prevailing wage to their workers if the project is 'paid for in whole or in part out of public funds.' " (*Duncan, supra,* 162 Cal.App.4th at p. 294.) ALP is correct that subdivision "(a)(2) *must* be given meaning separate and apart from 1720(a)(1)." Nevertheless, the fact that some infrastructure is encompassed by more than one subdivision does not negate the viability of either one or the possibility that, in another case, other improvements would be considered public work under one provision, but not both.

4. *The proceeds of Mello-Roos bonds are "public funds."*

ALP also contends the Project is not a "public work," because the proceeds of Mello-Roos bonds are not captured within the definition of "public funds" as that term is defined in section 1720, subdivision (b). We disagree.

 a. *Mello-Roos bond proceeds are public funds under the plain language of section 1720 and the Mello-Roos Act.*

Under the applicable provisions of section 1720, the phrase " 'paid for in whole or in part out of public funds' means all of the following: [¶] (1) The payment of money or the equivalent of money by the state or political subdivision directly to or on behalf of the public works contractor, subcontractor, or developer. [¶] . . . [¶] (4) Fees, costs, . . . bond premiums, loans, interest rates, or other obligations . . . that are paid, reduced, charged at less than fair market value, waived, or forgiven by the state or political subdivision. [¶] (5) Money loaned by the state or political subdivision that is to be repaid on a contingent basis." (§ 1720, subd. (b)(1), (4) & (5).)[11]

Mello-Roos bonds are a form of public financing that also constitute a payment of public funds under the PWL. The funds are paid by the CFD, a

---

[11] In addition to its concurrence with arguments advanced by ALP, CBIA argues the Legislature never intended the proceeds of Mello-Roos bonds to be considered "public funds" under the PWL because the Mello-Roos Act contains its own prevailing wage provisions. We cannot agree that the Mello-Roos Act contains a prevailing wage requirement.

The provisions to which CBIA refers are Government Code sections 53313.5 and 53314.9 which, as amended in 1986, state:

"A district may only finance the purchase of facilities whose construction has been completed . . . , except that a district may finance the purchase of facilities completed after the

public entity, to ALP, a private developer for the construction of public improvements. Mello-Roos bond financing is a payment of public funds under the plain meaning of the statutory language. (See *McIntosh, supra,* 14 Cal.App.4th at p. 1588 [" 'To determine the intent of legislation, we first consult the words themselves, giving them their usual and ordinary meaning.' "].) Under section 1720, subdivision (b), "paid for in whole or in part out of public funds" means: "[t]he payment of money or the equivalent of money by the state or political subdivision directly to or on behalf of the public works contractor, subcontractor, or developer." (§ 1720, subd. (b)(1).)

A CFD is "defined as 'a legally constituted governmental entity . . .' " and as such is an independent political body from the City. (*Friends of the Library of Monterey Park v. City of Monterey Park, supra,* 211 Cal.App.3d at p. 376.)

adoption of the resolution of formation *if the facility was constructed as if it had been constructed under the direction and supervision, or under the authority of, the local agency that will own or operate the facility.*" (Gov. Code, § 53313.5, italics added.)

"[T]he legislative body may accept advances of funds or work in-kind from any source, including, but not limited to, private persons or private entities . . . . *The legislative body* may enter into an agreement, by resolution, with the person or entity advancing the funds or work in-kind, *to repay all or a portion of the funds advanced, or to reimburse the person or entity for the value, or cost, whichever is less, of the work in-kind,* [provided] [¶] . . . [¶] (3) *Any work in-kind accepted pursuant to this section shall have been performed or constructed as if the work had been performed or constructed under the direction and supervision, or under the authority of, the local agency.*" (Gov. Code, § 53314.9, subd. (a), italics added.)

The language of these provisions mirrors that of section 1720, subdivision (a)(3), which states that "public works" includes "[s]treet, sewer, or other improvement work done under the direction and supervision or by the authority of any officer or public body of the state, or of any political subdivision or district thereof, whether the political subdivision or district operates under a freeholder's charter or not."

Nevertheless, we cannot agree that either provision, considered individually or collectively, contains a prevailing wage requirement, as such. The language of the two statutes is similar, but their goals are markedly different. The overriding purpose of the PWL is to protect and benefit workers on public works projects by vigorously enforcing minimum labor standards to ensure workers are not required to work under unlawful conditions, and to protect employers who comply with the law from those who attempt to gain competitive advantage at the expense of their workers by failing to meet those standards. (§ 90.5, subd. (a); *Lusardi, supra,* 1 Cal.4th at pp. 985–987.) The Mello-Roos Act serves an equally important, but different, purpose. That act provides "local officials with a key tool for accumulating the public capital needed to pay for the public works projects that make new residential developments possible." (Sen. Local Government Com., Analysis of Assem. Bill No. 373 (2007–2008 Reg. Sess.) as amended June 4, 2007, p. 1.)

If we assume, for purposes of argument, that the Mello-Roos Act contains a prevailing wage requirement, it nevertheless lacks an exclusive remedy provision precluding enforcement of the more specific prevailing wage requirements under section 1720. In any event, if, under a given set of facts, the two statutory schemes applied, that overlap would not require a determination of which controlled. (See *Shoemaker v. Myers* (1990) 52 Cal.3d 1, 21 [276 Cal.Rptr. 303, 801 P.2d 1054] ["where two statutes do not purport to deal with the same subject matter, there is no need to resort to the rule of construction that the more specific statute controls"].) The two statutory schemes are intended to address different "evils" and, as such, do not conflict; they can coexist. (*Id.* at pp. 22–23.)

The city council is the City's legislative body, and the governing body of the CFD. The City's manager and finance director maintain control over the CFD's fiscal agent and, pursuant to the Funding Agreements, have sole authority to authorize payment of Mello-Roos funds to ALP. Bond funds held by Wells Fargo on behalf of the CFD are held in the CFD's public coffers. The City, acting on behalf of the CFD, authorizes expenditures and controls disbursement of those funds. The Rosedale CFD issued bonds and paid ALP approximately $71 million in bond proceeds to perform public infrastructure work. Consistent with the Department's prior determinations, these funds have all the characteristics of "public funds." (See *Tustin Fire Station*, Pub. Works case No. 93-054, June 28, 1994 [money collected for, or held in coffers of, public agency constitutes "public funds" under § 1720].) Payment by the CFD to ALP is a payment of money or its equivalent from or on behalf of a "governmental entity" to a developer within the plain meaning of subdivision (b)(1).

The Mello-Roos Act itself also supports the conclusion that payment of proceeds from Mello-Roos bonds by the CFD constitutes a payment of money by a political subdivision of the state to a developer. The act is "a public financing mechanism." (See, e.g., Gov. Code, §§ 53311.5, 53313.5.) Under the act a CFD may only finance the purchase of a facility built after formation of the CFD "if the facility was constructed as if it had been constructed under the direction and supervision, or under the authority of, the local agency that will own or operate the facility." (Gov. Code, § 53313.5.) The Legislature's use of the word "purchase" in Government Code section 53313.5 supports the conclusion that a payment of Mello-Roos bond funds for the construction of public facilities and infrastructure improvements constitutes a payment of public funds, just as if the City had paid directly for construction of the public infrastructure work.[12]

---

[12] Legislative commentaries regarding amendments to the Mello-Roos Act (that postdate the changes to § 1720), demonstrate the Legislature's view that the proceeds of Mello-Roos bonds are a source of public funds to finance public improvement work. To the extent the plain meaning of a statute is unclear we look to other aids, such as the legislative history, to discern the Legislature's intent. (*Branciforte Heights, LLC v. City of Santa Cruz* (2006) 138 Cal.App.4th 914, 936 [42 Cal.Rptr.3d 96].) The analyses state:

"This bill authorizes, but does not require, local officials to pay builders for completed portions or phases of public works projects paid for under the Mello-Roos Act." (Sen. Rules Com., Off. of Sen. Floor Analyses, Unfinished Business Analysis of Sen. Bill No. 303 (2003–2004 Reg. Sess.) as amended June 11, 2003, p. 3.)

"I. The Mello-Roos Community Facilities Act allows counties, cities, special districts, and school districts to finance public works projects and a limited list of public services by levying special taxes (parcel taxes). A Mello-Roos Community Facilities District (CFD) issues bonds against these special taxes to finance the public works projects. . . .

"The Mello-Roos Act is an important feature of the local fiscal landscape, providing local officials with a key tool for accumulating the public capital needed to pay for the public works projects that make new residential development possible. Since 1985, CFDs have issued over

The CFD is not merely a conduit for payment by the City to ALP, and Mello-Roos financing is not akin to a loan that ALP must repay at market-rate interest.

ALP also argues that the Department itself has refused to treat publicly issued bonds as public funds for purposes of the PWL. In *Rancho Santa Fe Village Senior Affordable Housing Project* (Pub. Works case No. 2004-016, Feb. 25, 2005) (*Rancho Santa Fe*) <www.dir.ca.gov/dlsr/coverage/year2005/2004-016.pdf> (as of Dec. 21, 2010), a decision it has since declared nonprecedential,[13] the Department held that certain bond financing was not "payment of money or the equivalent of money" within the meaning of subdivision (b)(1). *Rancho Santa Fe* involved the financing of an affordable housing project, in part, by low-income housing "conduit" bonds issued by the California Statewide Communities Development Authority (CSCDA). The Department held that the conduit bond financing did not constitute the "payment of money or equivalent of money by the state or political subdivision" because (1) the bondholders of the conduit bonds had no recourse against the CSCDA for payments of principal, interest or any other money; (2) the interest rate for the bonds was not below market value simply by virtue of the bonds' tax-exempt status; and (3) the funds never entered the coffers of the political subdivision.

ALP contends that, as in *Rancho Santa Fe*, the proceeds from Mello-Roos bonds are not "public funds" because (1) the bondholders have no recourse against the City or the CFD for payment of principal, interest or other money; (2) the interest rate for the Mello-Roos bonds is not below market value; and (3) the funds never enter the City's coffers. ALP argues that, because the bond proceeds do not come from the coffers of a public agency, and are repaid solely by property owners through special taxes secured by liens on their nongovernmental properties located within the Project, the bond proceeds are, in effect, a kind of loan by the bondholders to ALP that is administered by the CFD and its fiscal agent. The City and the CFD have no

---

$18 billion in long-term bonds, mostly for capital improvements. CFDs created by cities account for the largest proportion of bond issues, having issued 51% of all Mello-Roos bonds between 1992 and 2002. Without access to Mello-Roos bond funding, many builders would have to pay higher development impact fees and raise housing prices." (Sen. Local Government Com., Analysis of Assem. Bill No. 373 (2007–2008 Reg. Sess.) as amended June 14, 2007, pp. 1–2.)

[13] While the administrative action was pending in this matter, the Department issued a public notice of its intent to discontinue its "practice of designating coverage determinations as precedential; . . . stripped prior determinations of precedential value, and announced that past and future coverage determinations would be 'advisory . . . only.' " (*Duncan, supra,* 162 Cal.App.4th at pp. 302–303; see Correction of the Important Notice to Awarding Bodies and Interested Parties Regarding the Department's Decision to Discontinue the Use of Precedent Determinations <http://www.dir.ca.gov/dlsr/09-06-2007(pwcd).pdf> [as of Dec. 21, 2010].)

obligation to repay the bonds or any cost associated with the bonds. Indebtedness on the bonds is assigned exclusively to ALP or its successors in interest. Moreover, the repayment obligation is not contingent, and the interest rate for the bonds is established by the market rate for tax exempt municipal bonds. Thus, ALP claims Mello-Roos bond proceeds are not "[m]oney loaned by the state or political subdivision that is to be repaid on a contingent basis" (§ 1720, subd. (b)(5)) or "interest rates . . . that are paid, reduced, charged at less than fair market value, waived, or forgiven by the state or political subdivision" (§ 1720, subd. (b)(4)). Therefore, the bond proceeds cannot be viewed as public funds under subdivision (a)(1) or any other provision of section 1720. Rather, the bond proceeds are assigned to the CFD's fiscal agent and, when bonds are sold, the proceeds are wired directly from the underwriter to the fiscal agent. As such, ALP asserts the bond proceeds are merely held in trust by Wells Fargo. ALP also claims the CFD exercises no more control over how the bond proceeds are used than did the issuer in *Rancho Santa Fe*, and the CFD has no discretion regarding "controlling" disbursement of bond proceeds. Rather, the Funding Agreements obligate the CFD and agencies to authorize payment of bond proceeds to ALP once the conditions of the Funding Agreements are satisfied.

We reject ALP's argument.

First, neither the City nor the CFD acts merely as a conduit for Mello-Roos bond financing. These governmental entities maintain exclusive control over expenditures, including construction costs, and are responsible for repaying the bonds with tax revenue. ALP's claim that the CFD is merely a conduit for Mello-Roos bond proceeds springs from its mischaracterization of the mechanics of the financing controlled by the Mello-Roos Act. The City established the CFD with authority to issue the bonds, maintains control over the CFD's accounts, and conducts its financial transactions by way of instructions to its fiscal agent. This is not, as ALP maintains, evidence that the City or CFD is merely a conduit for the Mello-Roos bond proceeds. Wells Fargo lacks authority to pay ALP absent an express authorization from the City's manager or finance director. No payments are made to ALP until the City inspects the completed public improvement work to ensure it complies with the City's approved plans. Further, the Mello-Roos bonds are paid off with special tax revenue received from the ultimate purchasers of the property, collected by the county.[14] ALP's claim that the funds never actually enter (or exit) public coffers is incorrect. The money enters public coffers and is

---

[14] The Mello-Roos bond arrangement for the Project requires ALP to pay market rate interest and provides that the bonds are not repayable on a contingent basis. Debt service, including interest, on the bonds will be paid from installments of the special taxes levied on properties within the Project, and the amount of those taxes is established in publicly recorded documents. A failure to repay the bond proceeds with interest will subject recipients to the risk of losing their property. If ALP sells a home in the Project, either ALP will prepay a special tax

retained there before it is paid to ALP. Tax revenue also is held in public coffers before it is paid to the bondholders.

This action is unlike *Rancho Santa Fe*, which provides an example of true conduit bond financing. There, the financing was accomplished through conduit bonds and the public entity assigned all of its rights, including possession and control of the money, to an independent third party. The public entity was truly a mere "conduit" to obtain bond funds; neither the initial bond funds nor the repayment funds were ever in the public coffers or under the public entity's control. The funds could not be characterized as "public funds," within the meaning of subdivision (b)(1). (*Rancho Santa Fe, supra*, at p. 7.) Mello-Roos bonds are different. Unlike true conduit bond financing, the CFD does not assign its right to control the payment of money to its fiscal agent.

ALP contends that Mello-Roos bond financing is not a payment of money or its equivalent by the City. Rather, it is akin to a loan the developer must repay. The trial court and the Department rejected this argument. We do too.

In the administrative decision, the Department observed that, according to the terms of the Funding Agreement, the City agreed, on the CFD's behalf, "to purchase with Mello-Roos bond funds" the completed public facilities and infrastructure improvements from ALP "for the cost of construction." ALP has sold or will sell developed parcels to individual property owners, who must pay special taxes to be collected by the county. Revenue from those taxes will be used to pay off the Mello-Roos bond indebtedness, which is not assigned to or assumed by ALP. The obligation to repay the bonds flows with the land. The mere fact that the bonds' financing mechanism "creates a form of indebtedness does not mean that the payment of Mello-Roos bond funds can be characterized as a loan to [ALP]." In its decision, the Department concluded the use of Mello-Roos financing rendered the entire Project a public work because "the Mello-Roos bond indebtedness is not being as-signed to or assumed by Developer."

ALP contends this conclusion, with which the trial court concurred, is wrong as a matter of statutory construction. Subdivision (b) defines "paid for in whole or in part out of public funds" to include, among other things: "interest rates . . . that are paid, reduced, charged at less than fair market value, waived, or forgiven by the state or political subdivision," and "[m]oney loaned by the state or political subdivision that is to be repaid on a contingent basis." (§ 1720, subd. (b)(4), (5).) ALP asserts that, according to

applicable to the portion of the Mello-Roos bonds allocable to such home, or the home buyer is subject to that obligation. If the special tax is not paid, the bondholder can require foreclosure of the property.

canons of statutory construction, there is a presumption that when a statute designates certain persons, things or manners of operation, omissions are taken as exclusions. (*White v. Western Title Ins. Co.* (1985) 40 Cal.3d 870, 881, fn. 4 [221 Cal.Rptr. 509, 710 P.2d 309]; see also *Duncan, supra,* 162 Cal.App.4th at p. 309 [interpreting the word "means," as used in § 1720, subd. (b) to be "a term accepted as one of limitation, not enlargement"].) Under this principle, ALP argues, by including fees and other funds "paid, reduced, charged at less than fair market value, waived, or forgiven by the state or political subdivision," or that will "be repaid on a contingent basis," the Legislature necessarily intended to exclude fees or funds which are not paid, reduced, charged at less than fair market value, waived, or forgiven by the state or political subdivision, or which will not be repaid on a contingent basis. Under this reasoning, the proceeds of the Mello-Roos bonds, which ALP argues is money loaned by a political subdivision that is not repayable on a contingent basis and is not charged at an interest rate less than market value, cannot be considered "public funds" for purposes of section 1720.[15]

ALP points to *In re Ritter Ranch Development, LLC* (Bankr. 9th Cir. 2000) 255 B.R. 760 (*Ritter Ranch*) to support its argument that Mello-Roos bond proceeds are essentially akin to a loan. In *Ritter Ranch,* a city issued Mello-Roos bonds to finance development and construction of public facilities on property within a CFD under the Mello-Roos Act. The bonds were repayable solely from special tax revenues earned from the property and accounts holding that revenue. The tax revenue and accounts were pledged as security for the bonds, and the city was obligated to use the tax revenues to pay the bonds through its fiscal agent. In exchange, the city was granted a continuing lien against the property, and had an obligation to foreclose on the property in the event of a default in payment of the special taxes. The court found the bonds were "limited obligations" because the bondholders had no rights as against city funds, other than the special tax revenues and accounts. Rather, in connection with a foreclosure action, the city as foreclosing municipality, acted as a " 'nominal plaintiff only, suing on behalf of bondholders,' " and " 'the foreclosure remedy is solely for the benefit of the bondholders.' " The court compared the bonds to "non-recourse loans to the City," where the sole source of repayment consists of the special taxes and their proceeds. (255 B.R. at p. 766.)

*Ritter Ranch* does not support ALP. *Ritter Ranch* found Mello-Roos payments to be public funds under section 1720, subdivision (b)(1), not a

---

[15] ALP asserts the suggestion that funds become "public funds" simply because they are provided by a political subdivision renders the language of subdivision (b)(4) and (5) meaningless. But the Department has not taken the position that Mello-Roos funding constitutes the payment of public funds under section 1720, subdivision (b)(4) or (5), nor does it characterize the payments by the CFD to ALP as a loan. Subdivision (b)(4) and (5) are inapplicable.

monetary loan under subdivision (b)(4) or (5). Moreover, nowhere did the court hold that Mello-Roos bonds are not a form of public financing, or that because the city's general funds are not at risk to the bondholders, that the Mello-Roos-related tax revenue somehow loses its character as public money for purposes of the PWL. Rather, the court found simply that the property owners had no contractual or other obligation to the bondholders. The court's analogizing Mello-Roos bonds to nonrecourse loans to the city was simply an artificial construct for the purposes of the bankruptcy proceeding—for the benefits of the bondholders. It has no application to the question whether the payment of Mello-Roos bond proceeds to ALP constitutes public financing.

In sum, we agree with the trial court's conclusion that Mello-Roos financing is a payment of public funds for construction under contract and meets the requirements of public works under section 1720, subdivision (a)(1). Absent an exemption, the PWL would apply to the Project in its entirety. (§ 1771.) As discussed below, however, the Legislature has limited the obligation to pay prevailing wages to works of public improvement.

5. *The obligation to pay prevailing wages applies to all required public improvements, including those paid for with private funds.*

ALP argues that even if the proceeds of Mello-Roos bonds constitute public funds for purposes of section 1720, only those infrastructure improvements actually constructed using proceeds of Mello-Roos bonds are subject to the PWL, not any public improvements constructed at private expense. We read the statute differently.

Once the determination is made that the Project is a "public work" under section 1720, subdivision (a)(1), the entire Project is subject to the PWL. In 2001, the Legislature enacted Senate Bill No. 975 (2001–2002 Reg. Sess.) to partially exempt from the prevailing wage requirements certain "private development projects" that are paid for in part with public funds. That exemption, codified at section 1720, subdivision (c)(2), applies if four requirements are met: (1) the public improvement work is required as a condition of regulatory approval; (2) the project is an otherwise private development; (3) the public entity must not contribute more money, or the equivalent of money, to the overall project than is required to construct the public improvement work; and (4) the public entity must not maintain any proprietary interest in the overall project. (§ 1720, subd. (c)(2).)

ALP maintains the trial court erred when it found the infrastructure exception of section 1720, subdivision (c)(2) subjected all public improvements associated with the Project to prevailing wage requirements. ALP and amici curiae contend that subdivision (c)(2) refers only to a singular "work of improvement" required as "a condition of regulatory approval."

They maintain the exemption requires that only enough work required as a condition of regulatory approval be performed at prevailing wages to make it true that the cost of that work exceeds the amount of the public funds contributed. In other words, if a public subsidy to a private development project is less than the cost of a single public work of improvement required as a condition of regulatory approval, then only that particular piece of construction—and not all or any other works required as a condition of regulatory approval—is a "public work" subject to the PWL.

Subdivision (c)(2) of section 1720 was intended as an exception to the definition of "public funds" in subdivision (b). ALP asserts that the trial court's reading of subdivision (c)(2) impermissibly expands the definition of "public works." According to ALP, the court's interpretation, if permitted to stand, would dictate that all infrastructure construction required as a condition of approval for private development projects would be subject to the PWL, without regard to the amount of public funds contributed to that project. Taken to its extreme, this would mean a contribution of one public dollar would be a contribution of "no more money, or the equivalent of money, to the overall project than is required to perform this public improvement work," and would trigger subdivision (c)(2). ALP maintains the trial court's failure to apply the exemption erroneously sweeps a broader range of works into the scope of the PWL by holding that all public improvements, regardless of whether they received public financing, are subject to prevailing wage requirements. ALP insists that, had the Legislature intended all infrastructure required as a condition of regulatory approval for a private project to be subject to the PWL, it would have said so directly, rather than to imply it indirectly through the subdivision (c)(2) exception.

The trial court dismissed this argument. It found ALP mistakenly focused on the term "public work of improvement" in the singular, rather than looking at the infrastructure works of improvement as a whole. We agree.

The legislative history of subdivision (c)(2) reflects that it was added to section 1720 to partially exempt from prevailing wage requirements certain "private development projects" paid for in part with public funds: "This bill would provide that certain private residential housing projects and development projects built on private property are not subject to the prevailing wage, hour, and discrimination laws that govern employment on public works projects."[16] (Legis. Counsel's Dig., Sen. Bill No. 975 (2001–2002 Reg. Sess.).)

---

[16] Subdivision (c) employs the phrase "Notwithstanding subdivision (b)," meaning that the partial exemption in subdivision (c)(2) applies to entire projects paid for in part from public funds.

Here, as a condition of its final approval, the City required that ALP construct certain infrastructure work to its specifications, including a school, parks, freight undercrossings, sanitation district facilities and backbone and in-tract street, bridge, storm drain, sewer, water/reservoir, dry utilities, park and landscaping improvements. These required public improvements cost much more than the City paid ALP. The City maintains no proprietary interest in the Project. The public funds contributed to the Project do not exceed the collective cost of these works of public improvement. Thus, the subdivision (c)(2) exemption applies, and all "public work of improvement [required] as a condition of regulatory approval" is subject to the PWL. (§ 1720, subd. (c)(2).) The Project is precisely the type of project the Legislature envisioned in enacting subdivision (c)(2). Prior to Senate Bill No. 975 (2001–2002 Reg. Sess.), once a project was determined to be covered, all work on the project was subject to the payment of prevailing wages. At the same time, public entities required private developers to build public infra-structure in order to develop private projects. In enacting Senate Bill No. 975 (2001–2002 Reg. Sess.), the Legislature intended to reduce, but not eliminate, the prevailing wage obligation for private development projects where the public funds paid do not exceed the cost of required construction.

■ ALP and the amici curiae attempt to narrow the scope of prevailing wage liability under section 1720, subdivision (c)(2) by arguing that any portion of required public improvement work that does not receive a direct allocation of public funds must be excluded from consideration. But subdivision (c)(2) contains no requirement that funds be directly allocated to specific works of public improvement, nor does it mandate a dollar-for-dollar reimbursement for required infrastructure improvements. Exemptions to the general provisions of a statute are narrowly construed and only apply to "those circumstances that are within the words and reason of the exception." (*Haas v. Meisner* (2002) 103 Cal.App.4th 580, 586 [126 Cal.Rptr.2d 843].) ALP's interpretation of subdivision (c)(2) attempts to narrow its liability by adding a direct funding requirement for specific improvement work. Under ALP's argument, subdivision (c)(2) would read, "only the public improve-ment work required for regulatory approval and paid for with public funds shall thereby become subject to this chapter." The actual language of the statute does not require that the public funds be traced to construction of the required work. Subdivision (c)(2) allows for the public contribution of money for the overall project so long as the funds contributed do not exceed the cost of constructing the required public improvements. ALP's attempt contractu-ally to allocate CFD funds to specific works of public improvement to limit its prevailing wage liability to structures for which it receives a direct allocation of public funds fails in light of the express language of subdivision (c)(2). ALP and amici curiae rely on a grammatical distinction in subdivision (c)(2) to argue that prevailing wages are only required on "a [singular] public work of improvement." The phrase "work of improvement," however, is not limited to

a single structure. For example, under Civil Code section 3106, a " 'work of improvement' " is defined as "the entire structure or scheme of improvement as a whole." This definition is consistent with our determination that the phrase "public work of improvement," as employed in Labor Code section 1720, subdivision (c)(2), refers to all public infrastructure, improvements or construction required as a condition of regulatory approval.

██ If ALP and amici curiae's interpretation of subdivision (c)(2) were to prevail, it would permit developers to allocate lump-sum public contributions to specific structures in order to minimize their prevailing wage obligations. This mechanism of circumvention would render ineffectual PWL requirements on most public improvement work. Subdivision (c)(2) requires the payment of prevailing wages for all required public improvement work and, as such, does not permit parties to parse the construction of public improvement work in any manner to avoid the PWL. (See *Lusardi, supra,* 1 Cal.4th at pp. 987–988 [parties may not avoid or limit prevailing wage obligations by contract].) ALP and the amici curiae devote significant attention to their claim that the decision, as upheld by the trial court, is inconsistent with the Department's prior determinations regarding prevailing wage requirements for private development projects. These arguments are puzzling. First, the determinations on which ALP and amici curiae rely are irrelevant. They involve a version of section 1720 in effect prior to the enactment of subdivision (c)(2). Second, our review of those determinations reveals that past determinations involving similar private development projects have consistently required compliance with the PWL for public improvement work.

ALP relies primarily on two of the Department's prior public works determinations, *Vineyard Creek* and *Chapman Heights*.[17] We note at the outset that the determinations in both cases are consistent with the determination here, with respect to the requirement that prevailing wages be paid for public improvement work.[18]

---

[17] *Vineyard Creek Hotel & Conference Center, Redevelopment Agency, City of Santa Rosa,* Public Works case No. 2000-016, October 16, 2000 (<https://www.dir.ca.gov/dlsr/ PWDecision.asp> [as of Dec. 21, 2010]) (*Vineyard Creek*) and *Chapman Heights, City of Yucaipa,* Public Works case No. 2003-002, January 30, 2004 (<https://www.dir.ca.gov/dlsr/ coverage/year2004/2003-022.pdf> [as of Dec. 21, 2010]) (*Chapman Heights*).

[18] In determinations issued prior to the decision at issue here, the Department consistently found that prevailing wage requirements apply to all required public improvements even though in some cases the public entity's contribution to the overall project was less than the cost of the required work. (See, e.g., *Lowe's Home Improvement Center,* Pub. Works case No. 2002-009, July 10, 2003; *Costco Retail Building, Pacheco Pass Retail Center, City of Gilroy,* Pub. Works case No. 2002-100, July 10, 2003; *Destination 0-8 Shopping Center, City of Palmdale,* Pub. Works case No. 2003-010, Oct. 7, 2003; *Slatten Ranch Project City of*

Second, *Vineyard Creek* and *Chapman Heights* involved projects with development agreements entered into prior to the passage of Senate Bill No. 975 (2001–2002 Reg. Sess.) when neither the public funds definitions in subdivision (b) nor the exemption in subdivision (c)(2) existed.[19] Subdivision (c)(2) was not considered in either case. The issue here is the correct interpretation of subdivision (c)(2), not whether the Department's nonprecedential analysis of a prior version of section 1720 should be applied. In both *Vineyard Creek* and *Chapman Heights*, the question was whether prevailing wage obligations applied to the otherwise private portions of the projects at issue under what is now section 1720, subdivision (a)(1). There was no dispute that prevailing wages were required for all public improvement work. Here, the issue is whether prevailing wages are required for all or just a portion of the required public improvement work. Since neither case addressed the applicability or interpretation of subdivision (c)(2) with respect to public improvements, neither bears on the issues before us.

Third, neither of the determinations on which ALP relies exempted any public improvement work from prevailing wage requirements. In *Vineyard Creek*, the issue was whether construction of a hotel, attached to a conference center paid for in part with public funds, constituted an integrated public works project. The Department found the project was a single project paid for in part with public funds. Accordingly, the entire project, including all public improvements and commercial construction was subject to prevailing wages. In *Chapman Heights*, all public improvement and infrastructure work was deemed subject to the PWL even though it appeared that the bond funds would not necessarily pay for all the public improvement work.[20]

---

*Antioch*, Pub. Works case No. 2003-020, Oct. 29, 2003; and *Sierra Business Park, City of Fontana*, Pub. Works case No. 2003-040, Jan. 23, 2004.) (<https://www.dir.ca.gov/dlsr/PWDecision.asp> [as of Dec. 21, 2010].)

[19] The determination in *Chapman Heights* was issued after the effective date of subdivision (c)(2) but addressed an earlier version of section 1720.

[20] ALP and RMV invite us to revive the five-part "integration" test employed by the Department in *Vineyard Creek* and *Chapman Heights* to determine whether public works of improvement are so "integrated" into an overall project that use of Mello-Roos bond proceeds on portions of the project renders the entire project a public work. We decline to do so. That test was developed in conjunction with a version of section 1720 which is no longer in effect, and applied in cases which lack any precedential value, even at the administrative level. More importantly, the precise integration test ALP and RMV urge us to adopt was presented to and rejected by the Legislature when it enacted Senate Bill No. 975 (2001–2002 Reg. Sess.). (See Assem. Com. on Jobs, Economic Development and the Economy, 3d reading analysis of Sen. Bill No. 975 (2001–2002 Reg. Sess.) as amended July 18, 2001; Assem. Com. on Jobs, Economic Development and the Economy, 3d reading analysis of Sen. Bill No. 975 (2001–2002 Reg. Sess.) as amended Aug. 30, 2001 (<http://www.leginfo.ca.gov/cgi-bin/postquery?bill_number=sb_975&sess=0102&house=B> [as of Dec. 21, 2010]); see also proposed amendments to Sen. Bill No. 975 on July 18 and Aug. 30.)

The Department argues the inclusion in Senate Bill No. 975 (2001–2002 Reg. Sess.) of subdivision (c)(2) was meant "to partially exempt from prevailing wage requirements certain 'private development projects' that are paid for in part with public funds." ALP and amici curiae contend that this argument proceeds from a false premise, namely that Senate Bill No. 975 (2001–2002 Reg. Sess.) amended the term "*construction*, alteration, demolition, installation, or repair work . . . done under contract" to read "private development *projects*." They point out that the only grammatical change effected by Senate Bill No. 975 (2001–2002 Reg. Sess.) to this element of the definition was to insert "installation" (and to recodify it from subd. (a) to (a)(1)). ALP claims section 1720 does not analyze public work and private work on the basis of an overall project or development. Rather, the statute is framed in terms of a work of "construction, alteration, demolition, installation or repair . . . done under contract. . . ." To speak of "partially exempting" a work of construction (the Project) from the PWL is to misconstrue the statute. The PWL imposes obligations as to specific works of construction, alteration, demolition, installation and repair. (§ 1720, subd. (a)(1).) ALP insists the statute does not impose a blanket prevailing wage obligation across an entire development, only to select particular works of construction as exempt.

In addition, ALP and the amici curiae argue subdivision (c)(2) is a limiting provision, and the analysis does not permit an integrated project conclusion at the outset. Their argument is as follows: the exemption was included to ensure that the imposition of prevailing wage obligations on certain publicly funded works of improvement did not have the effect of imposing obligations on other works within the same development. Subdivision (c)(2) begins with the premise that there is an "otherwise private development project." By its terms, subdivision (c)(2) assumes an entire development project is not a single "public work." The focus of subdivision (c)(2) is on a singular public work. That single public work is the work defined under the contract for construction as set forth in section 1720, subdivision (a). Subdivision (c)(2) goes on to say that if the political subdivision contributes no more money, or the equivalent of money, to the overall project than is required to perform "this public improvement work" (i.e., the singular "public work") "only the public improvement work" (again, referring to a singular public work) shall be subject to the PWL. So long as the money paid by the City does not exceed the cost of this individual construction, remaining private works of construction within the overall development will not be covered by the PWL.

▆▆▆▆ The Department insists ALP and amici curiae have it wrong. The Department has the better argument: subdivision (c)(2) was added to exempt private development work, not public improvement work. The plain language of subdivision (c)(2) limits prevailing wage obligations on certain private development "projects" to public improvement work required by a political subdivision as a condition of regulatory approval. The exemption only applies

if the public subsidy to the "overall project" does not exceed the cost of all mandated public improvement work. If a public entity's contribution exceeds the cost of required infrastructure work, the partial exemption is nullified, and prevailing wages are required for the entire project because it is "paid for in part out of public funds." ALP and amici curiae's contention that each piece of required public improvement work must be considered individually under subdivision (c)(2) without regard to development project as a whole is unworkable. A public entity's contribution to multiple improvements (i.e., the overall project) will frequently exceed the cost of a single piece of improvement work. Under ALP and amici curiae's interpretation, the subdivision (c)(2) exemption would never be satisfied. That situation would result in coverage of the entire project and expand prevailing wage requirements, not limit them. Moreover, under this interpretation, the partial exemption in subdivision (c)(2) would be rendered surplusage because, without project coverage, there would be no need to exempt the "private development" portion of an overall project. The Legislature's use of the words "overall project" means that both the required improvement work, as well as the development project itself, must be viewed as a whole.

▮ It is theoretically possible to apportion public funds to specific works of improvement or, to use the parties' example, to the construction of a sidewalk on the left side of a street while apportioning private funding to the right side. The Supreme Court, however, has specifically rejected a contract-based analysis that would allow a developer and public entity to agree to allocate all public funds to one piece of improvement work instead of applying it, in part, to pay for all required improvements. (See *Lusardi, supra*, 1 Cal.4th 976.) In *Lusardi*, the Supreme Court rejected a contract-based definition of public work, and held the statutory obligation of a contractor to pay prevailing wages may not be contracted away. The court stated: "To construe the prevailing wage law as applicable only when the contractor and the public entity have included in the contract language requiring compliance with the prevailing wage law would encourage awarding bodies and contractors to legally circumvent the law, resulting in payment of less than the prevailing wage to workers on construction projects that would otherwise be deemed public works." (*Lusardi, supra*, 1 Cal.4th at pp. 987–988.)

Moreover, even ALP's theoretical argument that the required public improvement work can be separated into individual construction contracts finds no support in the record. The Acquisition Agreement defines the "Project" to include all residential, commercial and infrastructure construction. Under the terms of that Agreement, all public improvement work required as a condition of governmental approval of the Project was eligible for CFD funding. As such, all work on the Project is funded "in part" with public funds.

The modification to the Acquisition Agreement (exhibit B) agreed to by the City and ALP, which represents the discrete components the parties actually agreed would receive Mello-Roos funding, does just what *Lusardi, supra,* 1 Cal.4th 976 prohibits. "Note C" in that modification agreement states that "each discrete component may be reimbursed separately from the underlying facility." According to *Lusardi,* however, the PWL does not permit parties to an agreement to carve up the individual components of an overall project into publicly and privately financed pieces. Subdivision (a)(1)'s "paid for in part" language renders this approach contrary to the Legislature's intent that projects that are at least partially funded with public funds are subject to prevailing wage requirements in their entirety. (§ 1720, subd. (a)(1).)

CBIA claims the Supreme Court rejected a "project-based" approach to public works coverage in *Long Beach, supra,* 34 Cal.4th 942. CBIA is mistaken. *Long Beach* addressed the meaning of "construction" under a version of section 1720, subdivision (a) that predated the adoption of Senate Bill No. 975 (2001–2002 Reg. Sess.). In *Long Beach,* the court held that public funds paid for preconstruction (not construction) did not create a public work.[21] The court stated: "[U]nder the law in effect when the contract at issue was executed, a project that *private* developers build solely with *private* funds on land leased from a public agency remains private. It does not become a *public* work subject to the [prevailing wage law] merely because the City had earlier contributed funds to the owner/lessee to assist in defraying such 'preconstruction' costs or expenses as legal fees, insurance premiums, architectural design costs, and project management and surveying fees." (*Long Beach, supra,* 34 Cal.4th at pp. 946–947.)

In contrast to *Long Beach,* this case does not involve a project built solely with private funds; public funds were used to finance construction of some mandated public infrastructure work. The pivotal nature of this distinction is highlighted in the conclusion of *Long Beach:* "The [prevailing wage law] does not apply in this case because no publicly funded construction was involved." (*Long Beach, supra,* 34 Cal.4th at p. 954.)

██ In sum, we conclude that, following the enactment of Senate Bill No. 975 (2001–2002 Reg. Sess.), section 1720 required a "project" based analysis. The contract-based approach advocated by ALP and amici curiae violates the fundamental rule of statutory construction that requires us to view the statute as a whole and consider its statutory language in the context of the entire statute and the scheme of which it is a part. (*Santa Clara Valley Transportation Authority v. Public Utilities Com.* (2004) 124 Cal.App.4th 346, 359 [21 Cal.Rptr.3d 270].) The Legislature specifically employed the term

---

[21] Section 1720, subdivision (a)(1) was subsequently amended to include work performed during the design and preconstruction phases of construction.

"project" in the Senate Bill No. 975 (2001–2002 Reg. Sess.) 2001 amendments to then section 1720, subdivision (a). Subdivision (b) defines the phrase "paid for in whole or in part out of public funds" of subdivision (a). ALP and amici curiae's contention that the statute is meant to address individual works of construction is belied by the language of that definition. For example, the definition of "paid for in whole or in part out of public funds" includes "[p]erformance of construction work by the state or political subdivision in *execution of the project*." (§ 1720, subd. (b)(2), italics added.) Coverage under subdivision (a) necessarily contemplates a "project" in at least some instances.[22]

■ Subdivision (c) enumerates the types of "projects" exempt from prevailing wage obligations (even where they are wholly or partially publicly funded), and provides additional confirmation the Legislature contemplated that "projects" are covered by subdivision (a)(1). Subdivision (c)(2) highlights the Legislature's focus of coverage analysis on an "overall project," both in terms of the conditions of regulatory approval (all the infrastructure that must be constructed, etc., in order to satisfy regulatory requirements), and the monetary contribution to the project as a whole. Subdivision (c)(3) also highlights the Legislative focus on the project as a whole, rather than individual construction contracts or components of a development project. It states: "If the state or a political subdivision reimburses a private developer for costs that would normally be borne by the public, or provides directly or indirectly a public subsidy to a *private development project* that is de minimis *in the context of the project, an otherwise private development project* shall not thereby become subject to the requirements of this chapter." (§ 1720, subd. (c)(3), italics added.) Subdivision (c)(3) reflects the Legislature's unequivocal intent that the public subsidy be viewed in the context of the cost of an entire development project.

■ In conclusion, we find the trial court correctly found, under section 1720, that the entire Project is a "public work," but that the requirement to pay prevailing wages is restricted to the construction of the public facilities and infrastructure improvements, whether publicly or privately funded.

---

[22] The term "project" is not new in California's statutory scheme. (See § 1771 ["public works projects"]; see also Cal. Code Regs., tit. 8, § 16001, subds. (b)–(e) [governing "Federally Funded or Assisted Projects," "Field Surveying Projects," "Residential Projects" and "Commercial Projects"].) The terms are routinely employed in coverage determinations. (See, e.g., *Redevelopment Agency of the City of Torrance*, Pub. Works case No. 93-023, Oct. 4, 1993 ["the construction of the parking, the improvements, and the housing units is a public works project because public funds are expended in part and all aspects of the project are integrally related"].) Moreover, courts consistently analyze coverage in terms of construction projects. (*Duncan, supra*, 162 Cal.App.4th at p. 295 [observing that the director "has the authority to give opinions as to whether 'a specific project or type of work' requires compliance with the prevailing wage law"], quoting Cal. Code Regs., tit. 8, § 16001, subd. (a)(1); see *Lusardi, supra*, 1 Cal.4th at pp. 988–989.)

## DISPOSITON

The judgment is affirmed.

Mallano, P. J., and Chaney, J., concurred.

A petition for a rehearing was denied January 10, 2011, and appellant's petition for review by the Supreme Court was denied March 2, 2011, S190216.